Hillsborough-northern judicial district
No. 2007-627

THE STATE OF NEW HAMPSHIRE

v.

TOMMY ROGERS

Argued: April 7, 2009
Opinion Issued: July 2, 2009

*Kelly A. Ayotte*, attorney general (*Nicholas Cort*, assistant attorney general, on the brief and orally), for the State.

*Theodore Lothstein*, assistant appellate defender, of Concord, on the brief, and *Stephanie Hausman*, assistant appellate defender, of Concord, orally, for the defendant.

DUGGAN, J. Following a jury trial in Superior Court (*O'Neill*, J.), the defendant, Tommy Rogers, was convicted of being an accomplice to kidnapping. *See* RSA 626:8 (2007); RSA 633:1 (2007). He appeals his conviction, arguing that the trial court erred in denying his motion to dismiss after the State refused to immunize defense witnesses, and in precluding him from inquiring about a witness's bias. We affirm.

The jury could have found the following facts. Until the fall of 2005, Matthew Tolson lived in Manchester. During that time, he became friends with the defendant, a self-described rapper and producer, who helped Tolson record a song in the hopes of producing and promoting it. That

arrangement fell through, however, when Tolson was unable to pay half the recording costs. During the fall of 2005, Tolson moved to Tennessee.

In March 2006, Tolson and his brother returned to Manchester. After arriving, they went to Angela Champoux's house, where they planned to stay. While Tolson was showering, the defendant came to Champoux's house and asked for him, but was told Tolson would call him when he was out of the shower. That evening, while Tolson was visiting an ex-girlfriend, the defendant contacted Tolson and asked if he wanted to get a drink later that night at Cinco de Mayo, a dance club in Manchester. Tolson agreed, and the defendant and his girlfriend, Ophelia Burnett, picked Tolson up in Burnett's car.

At Cinco de Mayo, Tolson, Burnett and the defendant sat at the bar, where they met Kyle Thorpe, a friend of the defendant. Tolson had two or three mixed drinks. He testified that approximately twenty or thirty minutes after arriving, somebody he did not know came up behind him and punched him in the head, causing him to fall to the floor. The man, whom Tolson later learned was Dwan Anderson, then ran from the club and drove away with three women in an SUV. Tolson left the club, and the defendant, Burnett and Thorpe accompanied him.

Tolson called his brother to arrange for a ride back to Champoux's house. Before his brother and Champoux arrived, however, the defendant offered to give Tolson a ride home. Tolson got into the rear of Burnett's car with Thorpe. The defendant drove and Burnett sat in the front passenger seat. While driving, the defendant "chirped" Anderson on his Nextel cell phone — a feature that operates like a walkie-talkie. Anderson informed the defendant that he had been pulled over.

The defendant stopped nearby and waited for Anderson to finish with the officer. Tolson testified that he expressed his desire to get home, and told the others he would walk. When he tried to exit the car, however, Anderson was outside and put a gun to his side, telling him to get back in the car. When he got back in, he was sitting between Thorpe and Anderson. The defendant told him how stupid he was for being set up, and that the man who punched him at Cinco de Mayo was actually his friend from Boston "who came up to take care of you for me." Throughout the car ride, the occupants of the car referred to Anderson by his nickname, "Little Cutter."

The defendant drove while Anderson held a gun to Tolson, ordering him to hand over his money, take off his clothes and remove the gold caps from his teeth. As they drove, the defendant continued to tell Tolson how stupid he was, stating that Tolson never should have stolen money and a gun from Burnett, and asking if he knew what a nine millimeter handgun could do to a person's head. Tolson testified that he had no idea what the defendant was talking about, but that he was nonetheless forced to apologize. After several

minutes, they arrived at an empty field and construction site in Litchfield, at which point Tolson was forced out of the car.

Burnett and Thorpe asked, "[A]re we going to kill [him] or what," and the defendant told him that they had "picked out a nice spot." They put his head on the trunk of the car, began laughing and Burnett took a picture of Tolson, naked, with a gun to his head. They then told Tolson to get into and then out of a dumpster, at which point he took off running. Although Tolson testified that he heard two or three gun shots, no evidence of gunfire was recovered at the scene. He then heard the squeal of tires and ran to a nearby condo development, where he awoke an elderly couple who called the police.

When the police arrived at the scene, they took Tolson's statement, in which he identified the defendant, Burnett, Thorpe and "Little Cutter." The police then set up surveillance at the defendant's home. The police saw Burnett leave the defendant's home in a Mercedes belonging to Burnett's sister, Olivia, and pulled her over a few minutes later. The defendant and Anderson left the apartment shortly thereafter. Unmarked police cars followed their SUV and observed what an officer described as counter surveillance maneuvers, such as changing directions, turning frequently and pulling into driveways.

When the police eventually stopped the car, they instructed the occupants to exit the vehicle. The defendant, Anderson and Olivia Burnett all exited the car; Anderson and the defendant were handcuffed. When the defendant started to give a false name, an officer told him they already knew who he was and arrested him. The officers, who did not then know that Anderson was Little Cutter, told him that he was not under arrest, but that they would like to talk to him. Anderson said he would talk to the police, but refused to have his handcuffs removed until after he was inside the police station. A later search of the car revealed the defendant's wallet, which was concealed in the overhead screen of a DVD player.

At the police station, in his first statement to the police, Anderson said that he was at the club with the defendant, and that the defendant and somebody named Little Cutter, whom Anderson pretended not to know, planned to scare Tolson. Anderson said that Little Cutter and the defendant devised a plan in which the defendant and Burnett would bring Tolson to the bar, at which point Little Cutter would confront Tolson and then run outside, causing Tolson to follow. Anderson then gave an account of the kidnapping that was similar to that given by Tolson, except that Anderson said he had followed the car in an SUV and watched the events as a bystander. At that point, the police formally arrested Anderson.

Meanwhile, the defendant told the police that he had met with Tolson the previous night. He said that he drove Tolson home and spoke with Tolson's

brother for a short time, drove Thorpe home, and then returned to his own apartment for the evening. The defendant also told the police that Anderson was called Little Cutter, and that Anderson had punched Tolson at the club.

When police told Anderson that the defendant had identified him as Little Cutter, he changed his story. In his second statement, he admitted he was Little Cutter, broke down in tears and said that Tolson did not deserve what had happened to him. He told the police he had punched Tolson because he and the defendant believed Tolson may have had a gun at Cinco de Mayo, but that he ran away before he could find the suspected gun. After being pulled over, he met up with the defendant, Burnett, Thorpe and Tolson. He said he walked to the defendant's car, opened the rear passenger door and saw Tolson reaching for what he thought was a gun. Anderson pointed his own gun at Tolson, said "don't even think of it" and told him to get back in the car.

Anderson said that once he was in the car, there was a conversation between the defendant and Tolson about how Tolson had allegedly taken a gun and money from Burnett while the defendant was away, and how Tolson had disrespected the defendant. Anderson told police that he took money, drugs, gold teeth and a gun from Tolson, and made him take off his shirt. Anderson said that the defendant drove to an unknown location, making comments about how Tolson had disrespected him, and stating that Burnett had "picked out a nice spot." When they arrived, they got out of the car, made Tolson take off the rest of his clothes and then told him to run into the woods naked as the defendant, Burnett, Thorpe and Anderson laughed. Anderson denied, however, holding the gun to Tolson's head against the trunk of the car.

After collecting additional evidence, the police interviewed Anderson for a third time that day. In his third statement, Anderson admitted he had held a gun to Tolson's head. He also asked the officers if they had recovered safes from the defendant's home and Olivia Burnett's car, and told them that they would find drugs and a gun in the safe in the car. An officer testified that throughout all three interviews Anderson did not appear to be under the influence of any narcotics or alcohol.

In addition to interviewing Anderson and the defendant, the police executed search warrants for the defendant's home as well as Ophelia and Olivia Burnett's cars. In the trunk of Olivia Burnett's car, police found the safe Anderson had mentioned, which contained a nine millimeter handgun with an obliterated serial number, ammunition, scales, what appeared to be cocaine residue and a key, which they matched to a safe in the defendant's home.

A year later, after pleading guilty to kidnapping Tolson, Anderson gave a fourth statement in a deposition as part of an agreement with the State to receive a reduction in his prison term; the deposition was read to the jury. In that statement, Anderson took full responsibility for the events that night and said that the defendant had no idea what was going on and took no part in the kidnapping. Anderson said that he went to Cinco de Mayo with three females, shared thirty shots of vodka with them, most of which he himself consumed. He stated that he inhaled roughly twenty lines of cocaine that night and consumed mushrooms, a hallucinogenic drug, but could not recall taking any drugs with Tolson. As he put it, "I was shroomed out, I was coked up, I was completely drunk." He said that the defendant was not at the club, and that Tolson offered to sell him cocaine, but was trying to "hustle" him, leading Anderson to punch Tolson.

Anderson stated that he left the club, was pulled over for driving without his headlights, and was forced to park the car because he had no license. He then returned to the club, saw Tolson exiting, took out his gun and forced him into Burnett's car before the defendant and the others arrived. He stated that when the defendant arrived, the defendant had no idea what was happening and tried to calm Anderson down. Anderson said he told the defendant to drive and began taking things from Tolson, including a gun, cocaine, a cell phone and gold teeth. As they exited the car, Anderson said he kept the gun on Tolson while the defendant tried to calm him. Anderson said that he eventually let Tolson go without firing his gun.

Anderson stated that during the earlier interviews with the police he felt pressured and manipulated into saying what the police wanted to hear, and that he was afraid of the defendant. He also stated that he had used approximately $1200 of cocaine that day, and was still high when police questioned him in connection with the kidnapping the following afternoon.

In contrast, one of the women with Anderson that night, Shiloh Piper, testified that she had not seen him using drugs that night at the club, in the SUV, or at her house earlier that evening. She also testified that Anderson had originally planned on going home after being pulled over, but changed his plans when the defendant called him. Additionally, the officer who stopped Anderson testified that although Anderson was driving without headlights, he was not speeding, driving erratically or crossing any lines. The officer described Anderson as a "[n]ice kid, very polite and coopera-tive." The officer testified that he did not observe any signs of impairment and had no reason to believe Anderson was intoxicated.

Piper also testified that Anderson spoke to her from prison and said that he thought "it was a setup" and that "the whole beef between him and [Tolson] was because of [the defendant], that . . . [the defendant] wanted him to take care of it" because Tolson owed the defendant $450. Kilsis

Javier, one of Anderson's girlfriends, also testified that a few days before the incident, Anderson had told her "he had a job to do and that [the defendant] was going to take care of him and he was going to pay him good and [there] was going to be a little time, jail time."

Before trial, Burnett and Thorpe both asserted their privilege against self-incrimination at separate *Richards* hearings. *See State v. Richards*, 129 N.H. 669 (1987). After the trial court found that they were justified in asserting the privilege and the State refused to immunize them, the defendant filed two motions to dismiss. The trial court concluded that although Thorpe and Burnett would provide testimony relevant to the defendant's defense of competing harms, their testimony would not be directly exculpatory. The trial court also noted that Anderson, and, presumably, the defendant, would testify to the same facts, thus making the testimony of Thorpe and Burnett cumulative. The trial court therefore denied the defendant's motions.

At trial, the defendant testified to a series of events vastly different from Tolson's account, and largely similar to Anderson's fourth statement. According to the defendant, Tolson had called him to see if he wanted to go out for the evening, and that he had no plans for meeting Anderson that night. He testified that while he was at the club, he saw Anderson and Tolson go into the bathroom together, and that he walked in and saw them snorting cocaine through a rolled up dollar bill. The defendant also testified that Tolson left the club multiple times to sell drugs, and was counting money each time he came back. He testified that while he was playing pool, he observed Anderson and Tolson get into an argument and saw Anderson punch Tolson and run from the club.

The defendant testified that after they left the club, he received a Nextel "chirp" from Anderson, telling the defendant that he had been pulled over. Before going to meet with Anderson, the defendant drove Tolson back to Champoux's house to retrieve the rest of the "product" that Tolson owed Anderson. They then went to meet Anderson, at which point, the defendant testified, Anderson explained that Tolson had tried to cheat him on a drug deal. After Anderson told the defendant there would not be any more problems, the defendant invited him to accompany them.

The defendant testified that once Anderson entered the car, he asked Tolson for the rest of the "product" Tolson owed him. Anderson was unhappy with what was produced, however, and at that point took out a gun and began threatening Tolson. The defendant testified that Anderson was out of control and high on drugs, and that he could do nothing to calm Anderson down. When the defendant tried to talk to Anderson, Anderson pointed his gun at the defendant and told him to drive. The defendant testified that Anderson gave him directions as they went, telling him to stay

away from a police station and eventually stopping in Litchfield. The defendant testified that he, Burnett and Thorpe were all terrified and pled with Anderson, asking him to stop. He testified that he was afraid for all of their lives and felt that he had no choice but to do as Anderson said.

The defendant testified that after they exited the car, he continued to talk to Anderson, attempting to calm him. He admitted that Burnett took a picture of Tolson with his head on the trunk, but denied that anybody apart from Anderson was laughing. He testified that Anderson eventually let Tolson go, and that the rest of them returned to the car and left.

After a six-day trial, a jury convicted the defendant. On appeal, he argues that the trial court erred in: (1) denying his motion to dismiss after the State refused to immunize Thorpe and Burnett; and (2) restricting his examination of Piper concerning her bias.

I

The defendant argues that the trial court's denial of his motion to dismiss after the State refused to immunize Thorpe and Burnett violated his due process rights under the State Constitution. Because the defendant does not argue that the denial violated his federal constitutional rights, we address his claim under the New Hampshire Constitution, citing federal opinions for guidance only. *See State v. Ball*, 124 N.H. 226, 232-33 (1983).

Pursuant to RSA 516:34 (2007), the State, with authorization from the attorney general or county attorney, may grant a witness use immunity and request a trial court to order the witness to testify. Under the immunity statutes, trial courts cannot grant immunity *sua sponte*. *See State v. Roy*, 140 N.H. 478, 481 (1995).

■ The notion of a defendant's right to obtain immunity for his witnesses was first considered when then-Judge Burger postulated the concept in a footnote in 1966. *See Earl v. United States*, 361 F.2d 531, 534 n.1 (D.C. Cir. 1966), *cert. denied*, 388 U.S. 921 (1967). Since then, we have recognized that "situations could arise in which to deny immunization from prosecution would deprive a defendant of due process on the facts of [his] case." *State v. Kivlin*, 145 N.H. 718, 721 (2001) (quotation omitted). Our analysis requires application of a two-part test. First, "[n]o such violation will be recognized . . . without a showing by the defendant that the testimony sought would be directly exculpatory or would present a highly material variance from the tenor of the State's evidence." *State v. Monsalve*, 133 N.H. 268, 270 (1990). Second, "[i]f the defendant demonstrates that [his] case falls within these narrow circumstances, we then decide whether, on the facts of the defendant's case, the executive branch's refusal to immunize a defense witness denied the defendant a fair trial." *Kivlin*, 145 N.H. at 721 (quotation and ellipses omitted).

The defendant argues that Thorpe and Burnett would have testified to events similar to those reiterated by the defendant, which presented a "highly material variance" from the tenor of the State's evidence. The State argues that the testimony of Burnett and Thorpe would have been cumulative, and could not outweigh the evidence presented by disinterested witnesses and the defendant's undisputed acts.

■ The first part of our analysis, whether the proffered testimony was directly exculpatory or of a highly material variance, requires the defendant to meet a high burden. In conducting our review, we look to whether the proffered testimony would have prevented the defendant's conviction. *Kivlin*, 145 N.H. at 722; *State v. MacManus*, 130 N.H. 256, 259 (1987); *see Blissett v. Lefevre*, 924 F.2d 434, 441-42 (2d Cir. 1991) (stating defendant must make showing that the testimony is material, exculpatory and not cumulative, as well as that he cannot obtain the evidence from another source), *cert. denied*, 502 U.S. 852 (1991). Furthermore, a variance from the tenor of the State's evidence is only "highly material" when the variance is irreconcilable with the State's case. *State v. Winn*, 141 N.H. 812, 816 (1997). This strict standard "reduces the possibility of cooperative perjury between defendants and their . . . witnesses and ensures that the judiciary will not lightly interfere with prosecutorial decisions . . . ." *Id.* at 815; *see Earl*, 361 F.2d at 534 (discussing separation of powers concerns in conferring witness immunity); *see also United States v. Turkish*, 623 F.2d 769, 772-77 (2d Cir. 1980) (discussing history and alternate justifications for defense witness immunity following *Earl*), *cert. denied*, 449 U.S. 1077 (1981).

■ After a review of the record, we find that this standard is fatal to the defendant's claim. We cannot say that Thorpe and Burnett's proffered testimony was the sort of exculpatory evidence that would have prevented the defendant's conviction. As the trial court noted, even if the witnesses could testify that the defendant was trying to calm Anderson, their testimony could not place the defendant elsewhere or preclude the possibility that the defendant had an agreement with Anderson to kidnap and terrorize Tolson. *See Kivlin*, 145 N.H. at 722-23; *State v. Farrow*, 118 N.H. 296, 306 (1978) (affirming denial of immunity when proffered testimony would not have provided defendant with alibi or otherwise exculpated him). Furthermore, Thorpe and Burnett were not expected to testify to any facts not presented in Anderson's deposition or the defendant's presumed testimony, thus making their testimony cumulative. *See Blissett*, 924 F.2d at 441-42. The defendant, therefore, has failed to show that the proffered testimony is directly exculpatory or of a highly material variance from the tenor of the State's case.

Moreover, there is nothing in the record to suggest that the State's refusal to confer immunity constituted prosecutorial misconduct or over-reaching. Indeed, in federal courts, prosecutorial overreaching is essentially the only factor considered when analyzing a trial court's refusal to dismiss after the prosecution's denial of immunity to defense witnesses. *See United States v. Mackey,* 117 F.3d 24, 27 (1st Cir. 1997) ("[I]n certain extreme cases of prosecutorial misconduct, the government's refusal to grant immunity could justify a court's refusal to allow the prosecution to proceed."), *cert. denied,* 522 U.S. 975 (1997); *United States v. Lord,* 711 F.2d 887, 890-91 (9th Cir. 1983) (stressing need for prosecutorial misconduct before denial of immunity to defense witnesses violates defendant's right to fair trial); *Turkish,* 623 F.2d at 777 (same); *United States v. Allstate Mortgage Corporation,* 507 F.2d 492, 495 (7th Cir. 1974) (noting importance of fact that prosecution did not secure any of its evidence by means of immunity grant), *cert. denied,* 421 U.S. 999 (1975). Here, the State did not secure its evidence through immunity grants, nor did it deny immunity to defense witnesses with crucial, exculpatory evidence unavailable from other sources. *See Winn,* 141 N.H. at 815; *see also People v. Priester,* 470 N.Y.S.2d 478, 480 (App. Div. 1983) (granting new trial where prosecution refused to immunize witness with important testimony bearing on defendant's intent).

For the foregoing reasons, we affirm the trial court's denial of the defendant's motion to dismiss.

## II

The defendant next argues that the trial court erred in circumscribing his examination of Piper. When the defense originally subpoenaed Piper, a "critical defense witness," she failed to appear and refused to cooperate. As a result, the defense requested that the trial court issue a material witness warrant, causing Piper to be arrested; she spent a Sunday night in jail before testifying on Monday. When Piper took the stand, she made damaging remarks during the State's cross-examination that the defendant had not expected, to wit: "[Anderson] told me that he thought it was a setup when I talked to him recently. . . . That the whole beef between [Anderson] and [Tolson] was because of [the defendant], that he had to take care of it because [the defendant] wanted him to take care of it, over four hundred and fifty dollars." On redirect, the defense attempted to impeach Piper, asking, "Isn't it true that you had to be arrested to come to court today?" The trial court sustained the State's subsequent objection on the grounds that the jury was already aware that Piper was testifying under subpoena, and that she was close to Anderson.

On appeal, the defendant argues that the jury was entitled to hear the fact that Piper had to be arrested before testifying because it provided a

motive for her to be angry with the defendant and lie about his participation. He argues that the trial court's restriction of his questioning violated his rights under Part I, Article 15 of the State Constitution. The defendant does not argue, however, that the ruling violated any of his federal constitutional rights; we therefore restrict our analysis to the State Constitution.

Part I, Article 15 provides that a defendant shall have a right "to meet the witnesses against him face to face, and to be fully heard in his defense." As a corollary, he has the right to impeach a witness's credibility through cross-examination, *State v. Rodriguez*, 136 N.H. 505, 508 (1992), including exposure of the witness's possible biases, *State v. Etienne*, 146 N.H. 115, 117 (2001).

We assume, without deciding, that the trial court's refusal to allow the defense to question Piper about her potential bias stemming from her arrest and night in jail was error. We agree with the State, however, that any error was harmless.

The State bears the burden of proving that an error was harmless. *State v. Goodale*, 144 N.H. 224, 232 (1999). Error is not harmless unless the State proves beyond a reasonable doubt that the error did not affect the verdict. *State v. Fox*, 150 N.H. 623, 624 (2004). In deciding whether the State has met its burden, we consider the strength of the State's evidence presented at trial, as well as the character of the excluded evidence, including whether the evidence was inconsequential in relation to the State's evidence. *Id.* An error may be harmless beyond a reasonable doubt if the alternative evidence of the defendant's guilt is of an overwhelming nature, quantity, or weight and if the inadmissible evidence is merely cumulative or inconsequential in relation to the State's evidence of guilt. *State v. Enderson*, 148 N.H. 252, 255 (2002).

Even if the fact that Piper was arrested and spent a night in jail was enough to make the jury disbelieve her inculpatory testimony, the State presented overwhelming alternative evidence to support the defendant's conviction beyond a reasonable doubt. Javier, for example, testified to an arrangement between Anderson and the defendant. Anderson's first three statements to the police also suggested such an arrangement, and that Anderson felt Tolson did not deserve what happened to him. In light of the overwhelming evidence of guilt, we conclude beyond a reasonable doubt that allowing the defense to question Piper about her arrest would not have affected the jury's verdict. Any error in excluding such testimony was therefore harmless.

*Affirmed.*

BRODERICK, C.J., and DALIANIS and HICKS, JJ., concurred.