Hillsborough-northern judicial district
Nos. 2004-833
2006-919

### THE STATE OF NEW HAMPSHIRE

v.

### DICKENS ETIENNE

Argued: May 12, 2011
Opinion Issued: December 21, 2011

58

*Michael A. Delaney*, attorney general (*Susan P. McGinnis*, senior assistant attorney general, on the brief and orally), for the State.

*Christopher M. Johnson*, chief appellate defender, of Concord, on the brief and orally, for the defendant.

CONBOY, J. The defendant, Dickens Etienne, appeals his conviction, following a jury trial, for the first-degree murder of Larry Lemieux. *See* RSA 630:1-a, I(a) (1996 & Supp. 2005). On appeal, he argues that the Superior Court (*Barry*, J.) erred by: (1) incorrectly defining the elements

of self-defense or defense of another in its jury instructions; (2) permitting hearsay testimony; (3) failing to order a new trial based upon perjured testimony of a State's witness and the State's failure to disclose exculpatory information; and (4) failing to order the State to immunize a witness for the purpose of ascertaining the extent of his perjured testimony. We affirm.

## I. Facts

The jury could have found the following facts. In January 2004, the defendant lived in a second-floor apartment at 265 Central Street in Manchester with his girlfriend, Cameo Jette, his friend, Israel Rivera, and Jette's friend, Jenna Battistelli. The defendant's other friends included Louis Pierre, Jose Gomez, Michael Roux and David Garcia. The defendant and Pierre were particularly close, because Amy Hannaford was then pregnant with the defendant's child, and her sister, Jennifer Hannaford, had three children with Pierre. The defendant and his friends were also acquainted with Larry Lemieux and Lemieux's friend, Latorre Johnson. The defendant was known as "D" among his friends and acquaintances.

Tensions developed between Lemieux and the defendant after Lemieux "hit on" Jette in December 2003, asking, "what somebody like [Jette was] doing with somebody like 'D.'" The defendant, upset, informed Lemieux that he was not permitted to be in the apartment or around Jette unless he was present. Around the same time, the relationship between Lemieux and Pierre also became strained. Lemieux had briefly dated Jennifer Hannaford, who lived one floor above the defendant in the Central Street apartment building. Although their relationship ended in December 2003, Lemieux continued to visit with Hannaford and her children, and Pierre had concerns about Lemieux being around his children.

In January 2004, Lemieux told Tina Gobis, whom he was dating, that he was going to have to leave town because either the defendant or Pierre was going to kill him. Lemieux told Autumn Millette, another woman he was seeing, that he had a "bad feeling" that the defendant did not like him. Battistelli overheard the defendant and Pierre discussing that Lemieux would "get his some day." The defendant later told Gomez that he was thinking about killing Lemieux.

In the late evening of January 27, 2004, Lemieux went to the defendant's apartment. The defendant was not at home, as he, Pierre, Roux and Garcia had gone to Foxwoods Casino in Connecticut. Rivera answered the door and informed Lemieux that he was not allowed to enter. At approximately 2 a.m. on January 28, Lemieux went upstairs to Jennifer Hannaford's apartment, where he attempted to sexually assault her. Rivera called the defendant and Pierre and informed them of what had occurred in Hannaford's apartment.

The defendant was upset when he learned what Lemieux had done, and told Rivera not to allow Lemieux back into the house. The defendant, Pierre, Roux and Garcia did not return to Manchester immediately because it was snowing, but the defendant and Pierre made several telephone calls to people in Manchester who were close to Lemieux, including Nancy Vaillancourt, at whose apartment Lemieux was staying.

When Lemieux awoke later that morning he spoke with Johnson by telephone. Johnson told him that the defendant was looking for him, and had called Johnson to ask if Lemieux had "disrespected" him by going to the Central Street apartment when he was not there and by saying "f*** 'D'" or "forget about 'D.'" After that conversation, Vaillancourt overheard an aggravated Lemieux yelling into the telephone, "I'll shoot the fair one with any of y'all bitch ass niggers." According to multiple witnesses, this phrase indicated that Lemieux was willing to have a "fist fight" with whoever was on the telephone. While the defendant, Pierre, Roux and Garcia were returning to Manchester from Foxwoods, Lemieux called Garcia's cellular telephone to speak with the defendant and Pierre. The defendant asked whether Lemieux had called him a "bitch" or a "bitch ass nigger." Lemieux responded in the negative, but Pierre and the defendant appeared upset and angry.

Lemieux left Vaillancourt's apartment driving Johnson's car, picked up Johnson and drove to Gobis's apartment. On the way there, Johnson heard Lemieux say into the telephone, "I'll be there," and Lemieux told him he had been speaking with Pierre. While at Gobis's apartment, Lemieux received a telephone call. Gobis heard Lemieux say, "[Y]es, I did call you a bitch ass nigger," and that he was on his way to Central Street. Once off the telephone, Lemieux told Gobis that he had been speaking to the defendant and that the defendant threatened to kill him. Lemieux then returned to Johnson's car and resumed telephone contact with the defendant, who was still on his way from Foxwoods. Although the defendant was already at the Bedford toll plaza, he told Lemieux that they were approaching Nashua, a lie Garcia believed was intended to allow them to arrive at the Central Street apartment before Lemieux. Lemieux told Pierre he was going to Central Street. The defendant telephoned Gomez and said that Lemieux had been disrespectful to him and "We have to wrap him up," meaning kill him. The defendant told Gomez to meet him on Central Street and bring a gun.

The defendant, Pierre, Roux and Garcia reached the Central Street apartment first. Jennifer Hannaford and her children were returning from grocery shopping, and Pierre told her to bring them upstairs right away. Inside the apartment, Pierre retrieved a .44-caliber pistol and some bullets from Rivera and the defendant retrieved his .9-millimeter Ruger pistol.

Battistelli overheard that Lemieux was on his way and that Gomez was also on his way, in a cab. The men went down to the front porch of the building, though Roux did so reluctantly.

Lemieux arrived shortly thereafter and walked onto the porch with his hands in his pockets. He approached Pierre so they stood face to face, about six inches apart. Roux stood in the doorway leading to the porch while the defendant, Rivera and Garcia stood in the area behind Lemieux. Pierre's gun was in his waistband, and the defendant's gun was plainly visible in his hand. Witness accounts differed as to what was said next. Rivera heard, "So you want to shoot the fair one?" and heard either Pierre, Garcia or Roux ask, "Why you reaching?" Garcia reported hearing Lemieux say, "F**k it. We can just shoot it out." Neither Johnson nor Pierre testified to hearing any of these statements. Pierre testified that he understood that, if Lemieux did not have a bullet in the chamber of his gun, he would have to take action to do so. (When Lemieux's gun was found, it was loaded, but there was no bullet in the chamber, and the slide would have to have been pulled in order to load the chamber.) The witnesses all agreed that the defendant and Pierre spoke to each other in Haitian Creole, and then the defendant stepped behind Lemieux, raised his gun, and shot Lemieux in the head behind his right ear. Lemieux's hands were inside his jacket when he was shot. He died immediately.

After the shooting, the group dispersed. The defendant, Pierre and Rivera drove toward Massachusetts. At some point, while they were still in New Hampshire, Pierre got out of the car. The defendant and Rivera continued to Rivera's brother's home in Brighton, Massachusetts, where the defendant showered and changed his clothes. He and Rivera then visited the defendant's sister's home, where he gave her a bag of his soiled clothing and spoke with her about being his alibi for the shooting. He telephoned Jette from a Massachusetts number and told her he was at his sister's home in Boston, and that he had heard about what had happened at the apartment. The defendant left his sister's home at 3 p.m., after approximately twenty minutes there, and drove to the Brighton Reservoir where he threw his gun, magazine and bullets onto the ice.

Around 6:30 p.m., the defendant visited the Manchester home of his friend Heather Metsch, who told the defendant she had heard that he had shot Lemieux. He responded that he had not been in Manchester at the time, and called his sister to have her verify that he had been in Boston with her that afternoon. After asking Metsch whether he should "go down to the police station to clear his name," the defendant left.

Upon arriving at the police station, the defendant approached Detective Sergeant Enoch Willard and said he was there to check on his friends' bail status. He told the detective that he had heard his friend Lemieux had been

shot in the back of the head, and that Garcia and all of his friends were under arrest. He added that he had not been there. The officer asked how he knew Lemieux had been shot in the back of the head and the defendant explained that his friend Heather had heard it on the news. The defendant sought information on the arrest and bail status of his friends, as well as Johnson, who was not a friend. When asked why he wanted to bail out Johnson if the two were not friends, the defendant stated that he wanted to bail everyone out to find out what had happened. The defendant terminated the fifty-five minute interview with the detective by stating that because he thought the detective believed him to be guilty of killing Lemieux, he was ending the conversation. The defendant left the station and met up with Jette. When they returned to the police station to check on Gomez's bail status, the defendant was arrested.

The defendant and Gomez next saw one another in the holding area at the Manchester District Court. At that time, the defendant indicated to Gomez that Pierre had killed Lemieux, that Garcia and Johnson were the only witnesses, and that Gomez needed to kill Johnson.

In February and March of 2004, the defendant sent letters to Amy Hannaford, Gomez and Jette. In his letters to Hannaford, he initially insisted that he was not involved with the murder, but later asserted that he shot Lemieux in defense of himself or Pierre. The defendant also wrote Hannaford, "Tell Autumn for what it's now worth I did not kill Larry and that I knew Larry was going to get killed two weeks before that, and that's why on that day I try calling him so many times to tell him not to meet with 'P.' " The defendant's early letters to Jette likewise insisted that he was not there, and that Jette could confirm it. In his letters to all three recipients, the defendant blamed Lemieux's death on various people, including Pierre, Johnson, and the first responders who attempted to resuscitate Lemieux.

The letters also included statements indicating the defendant sought to intimidate witnesses against him. His letters to Gomez stated that his brother was coming into town to make sure that no one testified against him, that he believed that Garcia and Johnson were lying about his involvement in Lemieux's death, and that Gomez was smart enough to know that people were trying to set them against each other. The defendant also wrote that Pierre, Roux and Gomez should get into trouble so that they would be transferred to his prison unit so the group could get their stories straight. The defendant asked Amy Hannaford to tell Pierre that the only people "telling lies" were Garcia and Johnson, and that he wanted to see what Pierre could do about Garcia. In April 2004, the defendant sent Jette a letter telling her to stay away from a particular house because his "boys from Boston" were "here to make sure no one show[ed] up in court" and

that they were "out to do anything." He asked Jette to "please stay away from the people that used to know me for about two months. I go to trial in two months."

The police interviewed Rivera on April 28, 2004. Rivera initially denied being present when Lemieux was killed, but then stated that he had been there but had not seen what happened. When asked directly who shot Lemieux, Rivera at first could not speak, his body shook and he broke down crying. Eventually he admitted that the defendant shot Lemieux and he led the police to the reservoir in Brighton.

In a May 2004 letter to Jette, the defendant told her to tell Johnson's brother that he had done a good job of looking out for the defendant because he had received word from Johnson that he was not going to testify, and, therefore, "that hit [was] off." He wrote in later letters to Jette that Pierre, Rivera and Roux were saying they were not present when Lemieux was shot, that Rivera and Gomez were "keeping it real" with him, that Johnson had "changed his mind," and that Garcia wanted to change his mind. Finally, the defendant wrote to Jette that the person who killed Lemieux had been "justified" in shooting him because Lemieux had tried to rape Jennifer Hannaford and had said he was returning with a gun.

Despite his earlier denial that he was Lemieux's killer, the defendant wrote letters in July 2004 to the Governor and to a superior court judge in which he claimed that he shot Lemieux in self-defense after Lemieux pulled out a gun. In an August 2004 letter, the defendant asked Amy Hannaford to tell Pierre to "tell them the truth" — *i.e.*, that Lemieux had had his hand on a gun when he was shot. The defendant wrote that this would be of more help to him than trying to get Pierre to be quiet.

In July 2004, the defendant was indicted for the first-degree murder of Lemieux. At trial, he claimed to have acted in self-defense and defense of another. The jury found the defendant guilty as charged. Following trial, the defendant learned of information leading him to believe that the State had withheld evidence regarding Gomez's cooperation with the Attorney General's Office on an unrelated case and that Gomez had committed perjury during the trial. Based on this information, he filed motions for a new trial, for a *Richards* hearing, *see State v. Richards*, 129 N.H. 669, 673-74 (1987), and to pierce the attorney-client privilege. The trial court denied all three motions. We accepted the defendant's discretionary appeal from those rulings, which we address along with the defendant's arguments in his mandatory appeal from his first-degree murder conviction.

## II. Jury Instructions

■■ "The purpose of the trial court's charge is to state and explain to the jury, in clear and intelligible language, the rules of law applicable to the case." *State v. Hernandez*, 159 N.H. 394, 400 (2009). "When reviewing jury instructions, we evaluate allegations of error by interpreting the disputed instructions in their entirety, as a reasonable juror would have understood them, and in light of all the evidence in the case." *Id.* "We determine whether the jury instructions adequately and accurately explain each element of the offense and reverse only if the instructions did not fairly cover the issues of law in the case." *Id.* "Whether a particular jury instruction is necessary, and the scope and wording of jury instructions, are within the sound discretion of the trial court, and we review the trial court's decisions on these matters for an unsustainable exercise of discretion." *Id.* "To show that the trial court's decision is not sustainable, the defendant must demonstrate that the court's ruling was clearly untenable or unreasonable to the prejudice of his case." *State v. Lambert*, 147 N.H. 295, 296 (2001) (quotation omitted). However, "[t]he interpretation of a statute is a question of law, which we review *de novo.*" *State v. Kousounadis*, 159 N.H. 413, 423 (2009).

Prior to trial, both the defendant and the State submitted proposed jury instructions on defense of self and defense of another. The defendant objected to certain aspects of the State's proposed instructions, including: (1) that a defendant may use only the amount of force that he reasonably believes is necessary to defend against deadly force; and (2) that a defendant may not rely upon self-defense if he, the third person, or he and the third person acting together, had provoked the use of deadly force. The trial court noted the defendant's objections, but gave instructions that were consistent with the State's proposals. The defendant now argues that the jury instructions constituted structural error, requiring reversal. We address the defendant's two claims of error in turn.

### A. The Necessity for the Use of Deadly Force

The trial court instructed the jury as follows:

> The defendant must reasonably believe that the amount of force he used was necessary for self-defense or defense of others. A person is not permitted to use excessive force in self-defense, only a reasonable amount of force. The defendant can use the amount of force which he believed was necessary under the circumstances as long as, at the time, there were reasonable grounds for his belief.

The defendant argues that this instruction was erroneous because "nothing in the language of RSA 627:4, II, . . . requires that the actor's use of deadly force be necessary, in the sense that no lesser, non-deadly force would suffice to prevent harm from the attacker's use of deadly force." He contrasts RSA 627:4, II (2007), which defines when a person is justified in using deadly force, with RSA 627:4, I (2007), which defines when a person may use non-deadly force. As to non-deadly force, the legislature explicitly provided that a person may defensively "use a degree of such force which he reasonably believes to be necessary," but as to deadly force it did not provide such a necessity requirement. RSA 627:4, I. Thus, the defendant asserts, the legislature deliberately omitted the necessity requirement in the application of defensive deadly force because it did not wish to require a person faced with deadly force to have to determine, at risk of legal culpability, the degree of force necessary to counter the attack. The defendant contends, therefore, that the trial court's jury instruction, which included a necessity requirement not explicitly mandated in the statute, reduced the State's burden of proof and requires reversal.

The State responds that the self-defense statute does not reflect a clear intent to abrogate the common law governing the permissible use of deadly force. It argues: "To the contrary, [the statute] actually seems to embrace the common-law principle of necessity by limiting the circumstances under which deadly and non-deadly force may be used and by attempting to strike a balance between legitimate defense and the needless sacrifice of human life." The State adds that "the plain language of the statute explicitly requires that a person not resort to the use of 'deadly force' unless that person has first determined whether 'he and the third person can, with complete safety' either '[r]etreat from the encounter,' RSA 627:4, III(a), '[s]urrender property to a person asserting a claim of right thereto,' RSA 627:4, III(b), or '[c]omply with a demand that he abstain from performing an act which he is not obligated to perform,' RSA 627:4, III(c)." The State concludes that the legislature, by applying these limitations to the use of deadly force, but not non-deadly force, did not clearly signal its intent to eliminate the common-law requirement that the actor's use of deadly force be necessary.

> Resolving this dispute requires that we interpret pertinent Criminal Code provisions. The interpretation of a statute is a question of law, which we decide *de novo. State v. Brown*, 155 N.H. 590, 591 (2007). In matters of statutory interpretation, we are the final arbiter of the intent of the legislature as expressed in the words of a statute considered as a whole. *State v. Gallagher*, 157 N.H. 421, 422 (2008). We construe the Criminal Code "according to the fair import of [its] terms and to promote justice." RSA 625:3

(2007). In doing so, we must first look to the plain language of the statute to determine legislative intent. *State v. Formella*, 158 N.H. 114, 116 (2008). Absent an ambiguity we will not look beyond the language of the statute to discern legislative intent. *Id.* Our goal is to apply statutes in light of the legislature's intent in enacting them, and in light of the policy sought to be advanced by the entire statutory scheme. *State v. Lamy*, 158 N.H. 511, 515 (2009). Accordingly, we interpret a statute in the context of the overall statutory scheme and not in isolation. *Id.*

*State v. McKeown*, 159 N.H. 434, 435-36 (2009).

RSA 627:4, II(a) (2007) sets forth the circumstances, relevant to this case, under which deadly force may be used:

II. A person is justified in using deadly force upon another person when he reasonably believes that such other person:

(a) Is about to use unlawful, deadly force against the actor or a third person . . . .

RSA 627:4, III (2007) (amended 2011)[1] sets forth limitations upon the use of deadly force. It provides:

III. A person is not justified in using deadly force on another to defend himself or a third person from deadly force by the other if he knows that he and the third person can, with complete safety:

(a) Retreat from the encounter, except that he is not required to retreat if he is within his dwelling or its curtilage and was not the initial aggressor; or

(b) Surrender property to a person asserting a claim of right thereto; or

(c) Comply with a demand that he abstain from performing an act which he is not obliged to perform; nor is the use of deadly force justifiable when, with the

---

[1] The legislature's most recent amendment to the statute, effective November 13, 2011, removes the duty to retreat when the actor is "anywhere he or she has a right to be" and was not the initial aggressor. This change does not affect our analysis. Although it could be read to reduce the efficacy of the State's argument that the requirement of retreat constitutes a balance implicit in the use of deadly force, it also undermines the defendant's argument that the legislature intended to remove necessity from the deadly force analysis, since the legislature saw fit to amend the duty to retreat, rather than explicitly remove necessity from the analysis after *State v. Warren*, 147 N.H. 567 (2002), discussed below.

purpose of causing death or serious bodily harm, the actor has provoked the use of force against himself in the same encounter.

(d) If he is a law enforcement officer or a private person assisting him at his direction and was acting pursuant to RSA 627:5, he need not retreat.

In contrast, with regard to non-deadly force, RSA 627:4, I, provides in pertinent part:

A person is justified in using non-deadly force upon another person in order to defend himself or a third person from what he reasonably believes to be the imminent use of unlawful, non-deadly force by such other person, and he may use a degree of such force which he reasonably believes to be necessary for such purpose.

The statute as a whole is thus susceptible of at least two reasonable interpretations: Either the restrictions placed upon the use of deadly force implicitly indicate that reasonable necessity under the circumstances is required for the defensive use of deadly force, or the explicit requirement of reasonable necessity in the non-deadly force provision, and not in the deadly force provision, implies that reasonable necessity is not required for the use of deadly force in the specific circumstances set forth in the statute. Our analysis is grounded in the irrevocable consequences of the use of deadly force: The explicit statutory requirement of reasonable necessity for the defensive use of *non-deadly* force recognizes that there are infinite degrees of force potentially available — none of which, by definition, would result in death; the implicit requirement of reasonable necessity in the defensive use of *deadly* force recognizes that *any* amount of such force may result in death.

We acknowledge that the competing interpretations are supported by various canons of statutory interpretation. The defendant's interpretation is supported by the principle *expressio unius est exclusio alterius*, the expression of one thing in a statute implies the exclusion of another. *See City of Manchester v. Sec'y of State*, 161 N.H. 127, 133 (2010) ("The force of the maxim *expressio unius est exclusio alterius* is strengthened where a thing is provided in one part of the statute and omitted in another." (quotation and brackets omitted)). However, the State's interpretation of the statute, also the interpretation supported by the commentary to the Model Penal Code, *see* MODEL PENAL CODE § 3.04 cmt. 2(a), 2(a) n.1, at 35 (1985) (interpreting statutes such as ours as implicitly "demand[ing] belief

in the necessity of the defensive action," and viewing the statute's implicit necessity requirement as "the consequence of a condition that the actor must have endeavored to avoid the combat or the injury by means other than the application of force"), is supported by numerous competing canons of statutory interpretation, and we ultimately find that interpretation more persuasive. "Maxims of interpretation based on customary language usage, such as the rule that expression of one thing implies the exclusion of another, have been held to have less weight when their application would produce a result in derogation of common law." 3 N. SINGER & J.D. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 61.2, at 340-43 (7th ed. 2008) (footnotes omitted); *see Bolduc v. Herbert Schneider Corp.*, 117 N.H. 566, 568 (1977).

■ "Statutes which impose duties or burdens or establish rights or provide benefits not recognized by the common law have frequently been held subject to strict, or restrictive, interpretation. Where there is any doubt about their meaning or intent they are given the effect which makes the least, rather than the most, change in the common law." 3 N. SINGER & J.D. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 61.1, at 314 (7th ed. 2008). "We have often stated that we will not interpret a statute to abrogate the common law unless the statute clearly expresses that intent." *State v. Elementis Chem.*, 152 N.H. 794, 803 (2005) (quotation omitted); *see also State v. Hermsdorf*, 135 N.H. 360, 363 (1992) ("In enacting legislation, the legislature is presumed to be aware of the common law: we will not construe a statute as abrogating the common law unless the statute clearly expresses such an intention." (quotations omitted)).

■ Our common law has long required reasonable necessity to justify the use of deadly force.

> The immense value at which the law appraises human life makes it legally reasonable that the destruction of it, as a means of averting danger, should be resorted to only when the danger is immense in respect of consequences, and exceedingly imminent in point of time. . . . On the question of the reasonable necessity of his act, the insufficiency and impracticability of other more tardy and less vigorous kinds of defen[s]e are to be considered.

*Aldrich v. Wright*, 53 N.H. 398, 407 (1873). In other words,

> a person is generally justified in using deadly force upon another only if such force is necessary to protect himself (or another) from the use of unlawful deadly force or an imminent threat to life or basic bodily integrity. Implicit in this rule are the notions: (1) that

deadly force should be used only when, and to the extent, "necessary"; and (2) that the force used in response to the threat should not be excessive in relation to the harm threatened.

*State v. Warren*, 147 N.H. 567, 569 (2002) (citations omitted). As we have previously stated, "Defensive force, in its kind, degree, and promptness, is measured by the consequence of using it, and the consequence of not using it: it should be proportioned to the apparent danger, viewed in the light of those consequences contrasted with each other." *Aldrich*, 53 N.H. at 402. "When force, purely defensive at first, increases and becomes more than is reasonably necessary for defen[s]e, the excess is aggressive and not defensive." *Id.* "When resistance starts beyond the reasonable necessity of the case, it may be divisible into two parts; so far as it is reasonably necessary, it is resistance; so far as it is not reasonably necessary, it is aggression." *Id.*

██ In our interpretations of the self-defense statute, we have looked to the common law for its balance of the right to defend oneself and the restrictions upon that right based upon "the general principle that the law places great weight upon the sanctity of human life in determining the reasonable necessity of killing a human being." *Warren*, 147 N.H. at 569 (quotation omitted). In *State v. Pugliese*, 120 N.H. 728, 731 (1980), we held, "We are not persuaded that the legislature's use of the term 'dwelling' was meant to restrict the common-law privilege to use deadly force in self-defense without retreating. Absent a clearer legislative indication, we will not construe a statute to change the common law." Most recently, in *State v. Vassar*, 154 N.H. 370 (2006), we reasoned that the "jury could have concluded from the testimony that the defendant reasonably believed deadly force was *necessary* to stave off the threat of 'unlawful, deadly force,' " and that the defendant was therefore entitled to a self-defense instruction. *Vassar*, 154 N.H. at 374 (quoting RSA 627:4 II(a)) (emphasis added).

The defendant's arguments in this case are similar to those in *Warren*, in which the defendant's literal reading of RSA 627:4 led him to argue that he was entitled to a jury instruction that he was justified in using deadly force against his roommate even if he believed that his roommate was about to use only non-deadly force against him. *Warren*, 147 N.H. at 569. We found that the defendant's literal reading of the statute "would be inconsistent with the general principle that the law places great weight upon the sanctity of human life in determining the reasonable necessity of killing a human being," and that "such a result would be absurd." *Id.* at 569 (quotation omitted). The relevant statutory provision was RSA 627:4, II(d) (1996), which states that "[a] person is justified in using deadly force upon

another person when he reasonably believes that such other person . . . [i]s likely to use any unlawful force in the commission of a felony against the actor within such actor's dwelling or its curtilage." We rejected the defendant's argument and acknowledged "the well-established common law principle that a person is generally justified in using deadly force only to meet the use of unlawful deadly force or an imminent threat to life or basic bodily integrity." *Warren*, 147 N.H. at 569. In applying the necessity requirement, we concluded that the "defense of dwelling" justification for the use of deadly force did not apply where the assailant was a cohabitant. *See id.* at 569-71. Thus, in *Warren* we looked to the common law in construing the language of the statute that on its face did not contain a necessity requirement.

■ A further indication of the legislature's intent not to abrogate the longstanding requirement of reasonable necessity is found in the actions the legislature has undertaken in the wake of *Warren*. The legislature has amended RSA 627:4 twice since *Warren*, and the amendments did not vitiate our holding that the deadly force provision implicitly required reasonable necessity. *See* 2B N. SINGER & J.D. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 49.5, at 35 (7th ed. 2008) ("[P]rinciples of stare decisis weigh heavily in favor of a judicial interpretation, since the legislature has power to change the law from what a court has construed it to be." (quotation omitted)); *id.* § 49.5, at 107 ("If the legislature has amended portions of a statute, but has left intact the portion sought to be construed, the legislature has declared an intent to adopt the construction placed on the statute by the administrative agency."); *id.* § 49.10, at 142-44 ("Where action upon a statute or practical and contemporaneous interpretation has been called to the legislature's attention, there is more reason to regard the failure of the legislature to change the interpretation as presumptive evidence of its correctness. Likewise, legislative action by amendment or appropriations with respect to other parts of a law which have received a contemporaneous and practical construction may indicate approval of interpretations pertaining to the unchanged and unaffected parts of the law."); *see also State v. Moran*, 158 N.H. 318, 323 (2009) ("If we had incorrectly construed the statute in [our earlier interpretation thereof], the General Court would presumably have clarified the text in the course of the five subsequent amendments."); *State v. Deane*, 101 N.H. 127, 130 (1957) ("The statute on which this repeated practical construction has been placed by the Bench and Bar, has been re-enacted by the Legislature without change in RSA 502:24, and constitutes a legislative adoption of its prior judicial interpretation." (quotation omitted)). The legislature's deci-

sion not to amend the pertinent provisions of RSA 627:4 in light of *Warren* indicates the legislature's adoption of our long-standing interpretation of the statute.

> An interpretation which preserves rights or benefits enjoyed under the common law is favored where the result avoids absurdity, retroactivity, unconstitutionality, is in keeping with good policy, is consistent with the purpose of the legislation, or is evident from a consideration of the statute read as a whole and in conjunction with other related statutes.

3 N. SINGER & J.D. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 61.2, at 340-43 (7th ed. 2008) (footnotes omitted).

 Here, the rule supporting interpretation of a statute to avoid or minimize its abrogation of the common law is supported by public policy. Under the defendant's reading of the statute, even if a person faced with a situation other than those specifically set forth in RSA 627:4, III knew that he could, "with complete safety," take some action short of using deadly force to protect himself or another from the use of deadly force, he would still be justified in taking a human life. Given the constitutional recognition of the natural right to life, and the great weight that law and society place on the sanctity of human life, *see, e.g., State v. Grierson*, 96 N.H. 36, 40 (1949) ("This maxim of retreating to the wall is a statement of fact properly illustrating the weight to be given to the sanctity of human life in determining the reasonable necessity of killing a human being . . . ."), the legislature most likely did not intend this result. We decline to infer from the legislature's silence regarding the reasonable necessity requirement in the deadly force provision of the justification statute that New Hampshire citizens have the right to kill when it is not necessary under the circumstances.

 Given our common law and the canons of statutory interpretation, we do not find that the legislature has expressed an intent to abrogate the deeply entrenched principle that in order for a killing to be justified, it must be reasonably necessary under the circumstances. *Cf. State v. Chrisicos*, 159 N.H. 405, 409-10 (2010) (noting that the legislature is free to amend the statute as it sees fit, should it disagree with our interpretation). Accordingly, we conclude that the trial court's instructions requiring reasonable necessity for the defensive use of deadly force were not erroneous.

*B. Provocation of the Attacker's Use of Force*

The trial court instructed the jury, as proposed by the State, as follows:

> A person does not — a person also does not have the right to use deadly force on another to defend himself or a third person if, one, with the purpose of causing death or serious bodily harm, the defendant provoked the use of force against himself or a third person in the same encounter. Or, two, with the purpose of causing death or serious bodily harm, the third person provoked the use of force against himself in the same encounter or, three, if acting together, with a purpose of causing death or serious bodily harm, the defendant or third person provoked the use of harm [*sic*] against the defendant or the third person in the same encounter.

The defendant argues that these instructions erroneously advised the jury that he did not have the right to use deadly force if a third person — here, Pierre — provoked the encounter. Thus, the defendant argues, the State's burden of proof was improperly "narrowed," resulting in structural error, requiring reversal.

RSA 627:4, III provides, in pertinent part, that the use of deadly force is not justifiable "when, with the purpose of causing death or serious bodily harm, the actor has provoked the use of force against himself in the same encounter."

■ The statute addresses only provocation by the actor and makes no reference to the effect of provocation by a third party. Thus, to the extent that the actor provoked the encounter, whether alone or in concert with a third person, the use of deadly force is not justifiable. We have previously addressed the issue of provocation by a defendant. *See State v. Bashaw*, 147 N.H. 238, 240 (2001) ("A defendant does not lose the right to use deadly force in self-defense, however, unless he uses words to bring about a fight in which he intended at the outset to kill or seriously injure his opponent."); *State v. Gorham*, 120 N.H. 162, 164 (1980) ("[I]f the jury concluded after the court's instruction that a defendant's use of words alone to bring about a fight in which he intended at the outset to kill his opponent was sufficient to destroy his legal defense, they were correct."). We have not, however, addressed the specific issues raised here: whether a third person's provocation alone would be sufficient to bar the defense, and whether the defendant must reasonably believe in the third person's innocence before deadly force in defense of the third person may be justified.

This case does not present us with a proper opportunity to decide the boundaries of the defense of others justification, as neither party argued, either at trial or on appeal, that Pierre, the person the defendant was purportedly defending when he killed Lemieux, had provoked the use of force; both parties at trial focused their arguments on the issue of provocation by the *defendant*. Thus, the State asserts that, even if the

instruction regarding provocation by a third person was error, the error was harmless because it did not relieve the State of its duty to disprove, beyond a reasonable doubt, that the defendant acted in defense of himself or another. Citing *Kousounadis*, 159 N.H. at 428-29, the defendant counters that a trial court's failure to instruct on an element of an offense constitutes structural error, and asserts that we must similarly regard an instruction that effectively relieves the State of part of its burden of disproving a defense.

 "Not all constitutional errors . . . are subject to harmless error analysis. Some errors require outright reversal. Thus, we must first determine whether the error at issue is subject to harmless error analysis." *Kousounadis*, 159 N.H. at 427.

> The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.

*State v. O'Leary*, 153 N.H. 710, 714 (2006) (citation and quotation omitted). "There are instances, however, when the error is so prejudicial that reversal is required without regard to the evidence in a particular case." *Id.* (quotation omitted). Errors fall into one of two categories: (1) structural defects; or (2) trial errors. *See State v. Ayer*, 150 N.H. 14, 24 (2003) (citing *Arizona v. Fulminante*, 499 U.S. 279, 308-12 (1991)).

> A structural defect affects the very framework in which a trial proceeds. Such defects arise from errors that deprive a criminal defendant of the constitutional safeguards providing a fair trial; therefore, if the trial proceeds after such an error occurs, justice will not still be done. When a structural defect exists, a criminal trial cannot reliably serve its function as a vehicle for the determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair. In contrast, a trial error occurs during the presentation of a case to a jury and can be quantitatively assessed in the context of other evidence in order to determine whether the error was harmless beyond a reasonable doubt. A structural defect, however, infects the entire conduct of the trial from beginning to end, and therefore constitutes an irreparable injustice that cannot be cured by jury instructions.

*Ayer*, 150 N.H. at 24 (brackets, quotations and citations omitted).

Errors that partially or completely deny a defendant the right to the basic trial process, such as the introduction of a coerced confession, the complete denial of a defendant's right to counsel, or adjudication by a biased judge, rise to the level of fundamental unfairness, thereby obviating consideration of the harmless error doctrine.

*State v. Dupont*, 149 N.H. 70, 75 (2003).

██ "[W]e have never clearly defined any single analytical framework for determining which constitutional errors are or are not subject to harmless error analysis." *Kousounadis*, 159 N.H. at 427. "Generally, if a defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis." *Id.* (quotation, brackets and ellipsis omitted). We have, however, held that an erroneous jury instruction relieving the State of its burden of proving an element of the offense constitutes structural error. *See, e.g., Kousounadis*, 159 N.H. at 429 ("[u]nder our State Constitution, a jury instruction that omits an element of the offense charged is an error that partially or completely denies a defendant the right to the basic trial process, and thus is not subject to harmless error analysis" (brackets, quotations and citation omitted)); *State v. Hall*, 148 N.H. 394, 400 (2002) (holding jury instruction amounting to presumption of defendant's mental state, the only element at issue, "requires reversal of the defendant's conviction and is not amenable to harmless error analysis"); *State v. Williams*, 133 N.H. 631, 633-34 (1990) (holding that in a securities fraud case, instructing jury that certain transferred interests "were securities" was akin to directing a verdict for the State on an element of the offense charged, requiring reversal without regard to the weight of the evidence).

██ "[P]art I, article 15 of the New Hampshire Constitution entitles a criminal defendant to a jury determination on all the *factual elements* of the crime charged." *State v. Soucy*, 139 N.H. 349, 351 (1995) (emphasis added).

Once evidence of self-defense is admitted, an instruction is required even if the evidentiary support is "not overwhelming," [*State v. Hast*, 133 N.H. 747, 749 (1990)], because the State bears the burden of disproving this statutory defense beyond a reasonable doubt, *see* RSA 626:7, I(a) (1996); *cf. State v. Soucy*, 139 N.H. 349, 352-53 (1995) (discussing the evidentiary support requiring a jury instruction on a defense that the State must disprove beyond a reasonable doubt). Moreover, when evidence of self-defense is admitted, conduct negating the defense becomes an element of

the charged offense, *see* RSA 625:11, III(c) (1996), which the State must prove beyond a reasonable doubt, RSA 625:10 (1996).

*State v. McMinn*, 141 N.H. 636, 645 (1997). In *Soucy*, we analyzed the relative burdens when the defendant has raised a defense. *See Soucy*, 139 N.H. at 352 (ruling that trial judge's exclusion of supervening causation evidence from jury consideration was error rendering the trial fundamentally unfair, and, therefore, not subject to harmless error analysis). *Soucy*'s analysis of the parties' differing burdens and of what must be submitted to the jury under Part I, Article 15 of the New Hampshire Constitution therefore informs our analysis here.

> A pure defense is a denial of an element of the offense, while an affirmative defense is a defense overriding the element. The former must be negated by the State by proof beyond a reasonable doubt and must be submitted to the jury for determination. The latter need not be negated by the State.

*Id.* at 352-53 (citations omitted). Our Criminal Code provides that self-defense or any "[c]onduct which is justifiable under [RSA chapter 627] constitutes a defense to any offense," RSA 627:1 (2007), and "[w]hen evidence is admitted on a matter declared by this code to be . . . [a] defense, the state must disprove such defense beyond a reasonable doubt." RSA 626:7, (I)(a) (2007). The legislature has thus determined that self-defense and defense of others constitute pure defenses, and, thus, negating such a defense becomes an element of the offense that the State must prove beyond a reasonable doubt.

 This case does not share the infirmity common to *Kousounadis*, *Hall*, *Soucy* and *Williams*, in which the trial court's jury instructions effectively denied the defendant the jury's determination as to a factual element of the offense. *See, e.g., Kousounadis*, 159 N.H. at 428-29 ("The failure to instruct the jury on one element of a crime is thus indistinguishable from a directed verdict, and deprives a defendant of his right to a jury trial. . . . [T]rial by jury means determination by a jury that *all elements* were proved" (quotation, citation, and parenthesis omitted)). *Compare State v. Bundy*, 130 N.H. 382, 383 (1988) ("Under the facts of this case, the trial court's supplemental charge could not possibly have invaded the jury's exclusive fact-finding province.") *with State v. Jones*, 125 N.H. 490, 494 (1984) (finding that a judge's instruction probably had the effect of superseding the exercise of the jurors' own judgment contrary to Part I, Article 15 of the New Hampshire Constitution). In the cases where we found the court's instructions constituted structural error, it is clear that the jury did not decide all of the elements of the offense, either because the

element was not submitted to the jury, *Kousounadis*, 159 N.H. at 428-29, or because "the judge, and not the jury, determined an essential element of the crime," *Williams*, 133 N.H. at 634-35, by withholding evidence on an issue, *Soucy*, 139 N.H. at 352, or by creating a mandatory presumption on an element, *Hall*, 148 N.H. at 398-99.

Here, the jury charge placed the "burden of proving guilt . . . entirely on the State." Specifically as to the "defense of others" justification, the court charged the jury: "[T]he State must prove beyond a reasonable doubt that the defendant did not act in self-defense or in defense of others. If you have a reasonable doubt as to whether the defendant acted in self-defense or in defense of others, you must find the defendant not guilty." The trial court's instruction went on to present the jury with three factual provocation alternatives, any one of which would negate the defense, if such provocation were undertaken with the purpose of causing death or serious bodily harm: (1) "the defendant provoked the use of force against himself or a third person in the same encounter," or (2) "the third person provoked the use of force against himself in the same encounter," or (3) "acting together, . . . the defendant or third person provoked the use of harm [*sic*] against the defendant or the third person in the same encounter."

Assuming, without deciding, that factual alternative (2), allowing the jury to find that the State had disproved the defense if it proved provocation by a third person, constituted an erroneous statement of law, we nonetheless conclude that the defendant's conviction was based upon the jury's finding that the State had proven all elements of the offense beyond a reasonable doubt. *See Kousounadis*, 159 N.H. at 428 ("Harmless error analysis depends upon the existence of a verdict of guilty beyond a reasonable doubt on the elements of the crime. The appellate court must assess the possibility that the error affected the jury's verdict. If there is no verdict on an element of the crime, it is not possible to conclude that the error did not affect the verdict." (quotation omitted)).

First, we conclude that the error could not have affected the verdict because neither the defense nor the State argued to the jury that the third party, Pierre, had provoked the encounter. The State, the party that would stand to benefit from the error if it had argued that Pierre's provocation vitiated the defendant's justification defense, argued that the Pierre/Lemieux dispute was a red herring and that the defendant was the person who provoked Lemieux to fight.

Further, the evidence does not support a finding that Pierre alone provoked the encounter. It was the defendant who was upset to learn that Lemieux had defied him by going to his apartment when he was not there and who told Rivera not to allow Lemieux back into the house. Although, in

response to the news from Manchester, both the defendant and Pierre made telephone calls to people who were close to Lemieux, it was the defendant who telephoned Johnson looking for Lemieux. While Johnson overheard Lemieux say into the telephone, "I'll be there," and understood that Lemieux had been speaking with Pierre, it was the defendant who threatened to kill Lemieux, as Lemieux told Gobis. It was the defendant who lied to Lemieux about his distance from Manchester in order to allow the defendant and his friends to arrive on Central Street before Lemieux. It was the defendant who asked Gomez to meet the defendant on Central Street and to bring a gun with which to "wrap up" Lemieux. It was the defendant who was waiting on the porch with a gun plainly visible in his hand. And ultimately, it was the defendant who stepped behind Lemieux and fired the only shot in the encounter.

██ Thus, we conclude that the jury instructions properly assigned to the State the burden of proof as to all elements of the offense. To the extent the instructions erroneously advised the jury that the State could disprove self-defense or defense of others by establishing a third party's provocation of the encounter, the record establishes beyond a reasonable doubt that such instruction did not contribute to the defendant's conviction. *Compare State v. Reid*, 134 N.H. 418, 423 (1991) (finding where the jury "was instructed that it could convict the defendant if he *should have known* the individual effecting the arrest was a law enforcement official, the jury may have convicted the defendant on this lesser standard," and reversal was required pursuant to *Williams*). Thus, even assuming that the court's instructions as to third party provocation were erroneous, the error was not structural, and therefore is subject to harmless error analysis.

"To establish that an error was harmless, the State must prove beyond a reasonable doubt that the error did not affect the verdict." *O'Leary*, 153 N.H. at 714. Because we have concluded above that the defendant's conviction was based upon the jury's finding that the State had proven all elements of the offense beyond a reasonable doubt, regardless of any error in the provocation instruction, we find that the State has met this burden. *See id.*

*III. Admission of Gobis's Testimony Regarding a "Dispute"*

During the testimony of Tina Gobis, the State asked, "Did Larry Lemieux ever tell you whether or not there was any source of dispute or tension between him and . . . [the defendant]?" The court sustained the defense's objection to that question after Gobis answered in the affirmative. The prosecutor then asked, "[H]ow did you know there was any sort of dispute between the defendant and Larry Lemieux?" The court overruled

the defense's objection to this question and Gobis testified that Lemieux had told her. When the defense objected and further moved to strike Gobis's response, the prosecutor explained that he did not offer the evidence for the truth of the matter asserted, but only to show that Lemieux had made the statement. The court denied the defense's motion to strike.

The defendant argues that this evidence was erroneously admitted because it does not fall within any hearsay exception, and if it was not admitted for its content, then its probative value was minimal, while its prejudicial value was significant. He asserts that "the jury likely used the evidence for the hearsay purpose of proving enduring hostility between Etienne and Lemieux," an important and contested issue at trial. The State responds that even if the admission of this testimony was error, it was harmless beyond a reasonable doubt because the testimony was cumulative as to the animosity between Etienne and Lemieux, and because other evidence of guilt was overwhelming.

■■■ "An error is not harmless unless the State proves beyond a reasonable doubt that it did not affect the verdict." *Id.* "In determining whether the State has met its burden, we consider the strength of the State's evidence presented at trial, as well as the character of the excluded evidence, including whether the evidence was inconsequential in relation to the State's evidence." *Id.* "An error may be harmless beyond a reasonable doubt if the alternative evidence of the defendant's guilt is of an overwhelming nature, quantity or weight and if the inadmissible evidence is merely cumulative or inconsequential in relation to the State's evidence of guilt." *Id.*

■■■ Assuming without deciding that there was error here, we agree with the State that it was harmless. As to the specific issue of hostility between Lemieux and the defendant, the record contains ample evidence of animosity between the two. Autumn Millette, another romantic partner of Lemieux, testified without objection that Lemieux had previously said that he had a "bad feeling" because the defendant did not like him. Gomez testified that there was a dispute between Lemieux and the defendant in the weeks leading up to the shooting, that the defendant said that he had heard that Lemieux was "[t]alking a lot of s**t" about him and threatening to do something to him, and that the defendant had been angry after Lemieux "hit on" Jette while belittling the defendant. Gomez also testified that the defendant said he was considering killing Lemieux, and finally that he needed to kill him. Garcia testified that the defendant and Lemieux had a dispute in late December or early January and that there was tension between them. He also testified that the defendant had been upset and had

several conversations, including with Lemieux and Garcia, about the situation between Lemieux and Jette, that the defendant had been upset about the calls from Central Street, and that the defendant had been concerned because Jette was afraid of Lemieux. Battistelli testified, without objection, that the defendant and Pierre had discussed that Lemieux would "get his some day" and that the defendant had been upset about Lemieux flirting with Jette. She further testified that there had been a dispute at Central Street in the hours leading up to the murder. Johnson testified, without objection, that the defendant had asked whether Lemieux had gone to Central Street and "disrespect[ed] him," and that the defendant had sounded upset while inquiring whether Lemieux had said "f*** 'D' " or "forget about 'D.' " Gobis herself testified, without objection, that Lemieux had told her that he was going to leave town because either Pierre or the defendant was going to kill him, and that on the day of the murder the defendant had "threatened to kill him."

The record thus contains overwhelming alternative evidence of the developing animosity between the defendant and Lemieux, without consideration of Gobis's objected-to statements.

Further, other evidence overwhelmingly established the defendant's guilt. On the day Lemieux was killed, the defendant gave himself time to prepare to kill Lemieux by telling Lemieux he was much farther from Manchester than he truly was. He asked Gomez to meet him at Central Street and to bring a gun. The defendant and his friends armed themselves. The defendant waited for Lemieux with a gun clearly visible in his left hand. After Lemieux arrived and began arguing with Pierre, the defendant then moved the gun to his right hand, said something to Pierre in Haitian Creole, stepped behind Lemieux, raised his arm, and shot Lemieux at a downward angle behind the right ear. The careful placement of the shot prevented the bullet from hitting Pierre, who was face to face with Lemieux, and resulted in Lemieux's instantaneous paralysis and rapid death.

The defendant then fled the scene, took a shower, put on clean clothing, gave his soiled clothing to his sister, talked about her providing him with an alibi, and disposed of the gun, magazine, and bullets. He first also lied and repeatedly changed his story to conform to the discovery. He claimed that he had been in Boston at the time of the murder and had learned from his friend Heather upon his return to Manchester that Lemieux had been shot and his friends were in custody. He then said that he had left Manchester around the time of the murder. He wrote to Jette that Lemieux had drawn first, but the person who killed Lemieux in self-defense was not him, and that he had been present when Pierre killed Lemieux. He also admitted that he had known Lemieux was going to be killed. He then finally claimed

that he had killed Lemieux because Lemieux had pulled out a gun. He also threatened, bribed, intimidated, and put "hits" on the witnesses who were not saying what he wanted. These facts were all "evidence of the defendant's consciousness of guilt." *State v. Bean*, 153 N.H. 380, 387 (2006); *see also State v. Littlefield*, 152 N.H. 331, 335 (2005) (flight demonstrates consciousness of guilt).

In light of the alternative evidence establishing the dispute and animosity between the defendant and Lemieux, as well as the overwhelming evidence of the defendant's guilt, Gobis's testimony was cumulative, and the State has established that the error, if any, was harmless beyond a reasonable doubt.

*IV. Motion for New Trial*

The defendant asserts that the trial court erred in denying his motion for a new trial. He argues that the State failed to disclose exculpatory evidence relating to a plea bargain concerning Gomez and that Gomez committed perjury.

*A. Background*

On January 20, 2005, the defendant filed a motion for a new trial, alleging that: (1) the State withheld exculpatory evidence; and (2) Gomez, a material prosecution witness, provided perjured testimony at trial. Thereafter, he moved for a *Richards* hearing, *see Richards*, 129 N.H. at 673-74, and to pierce Gomez's attorney-client privilege. Over Gomez's objection, the trial court held a *Richards* hearing, during which Gomez asserted his Fifth Amendment right against self-incrimination in response to several areas of questioning. The defendant asked the court to order the State to provide immunity to Gomez for the purpose of exploring his allegedly perjured trial testimony. In an order dated September 12, 2006, the trial court denied the motion for a new trial, and found that it was "unnecessary to immunize Gomez or to penetrate the attorney-client privilege to ascertain the extent to which Gomez claims he committed perjury."

At trial, Gomez presented testimony that the defendant argues was material in establishing the premeditation element of his first-degree murder conviction, and, therefore, Gomez's credibility was a major issue at trial. The defendant contends that Gomez's credibility was bolstered by his trial testimony that he was testifying without the benefit of any immunity, plea deals or offers of leniency. The defendant claims that the State, during closing argument, relied upon this purported lack of a plea deal and argued that Gomez had no motive to lie because he had not received any consideration from the State.

The State acknowledges that, at the time of his testimony, Gomez had pleaded guilty to, and been sentenced on: (1) charges alleging falsifying physical evidence and being a felon in possession of a handgun following Lemieux's murder; and (2) charges involving drug trafficking, which the State asserts were unrelated to the prosecution of Lemieux's murder. The falsifying physical evidence and felon in possession of a handgun charges related to Lemieux's murder and were prosecuted by Jennifer Sandoval, of the Hillsborough County Attorney's Office; the drug charges were prosecuted by Susan Morrell, of the New Hampshire Attorney General's Office. At the defendant's trial, Gomez testified regarding the sentences he had received for both sets of charges. After the defendant's trial was concluded, defense counsel learned of a proffer letter from the Attorney General's Office recommending a suspended sentence on Gomez's drug charges and referencing Gomez's "attempts to cooperate with the State."

On December 4, 2004, Gomez met with defense investigator Kathy Tinklepaugh and told her that "perjury was done," that he was "asked to do it," and that he had spoken with the defendant after the trial. On December 7, 2004, the defendant's trial counsel obtained from the Attorney General's Office the proffer letter, dated June 30, 2004, between Susan Morrell and Gomez's counsel, Adam Bernstein. Attorney Morrell explained the letter's contents to the defendant's trial counsel as follows:

> Mr. Gomez did not receive any consideration for his "cooperation" in the matter of State v. Dickens Etienne. At no time was he offered, or given any consideration in connection with Etienne's case.

> The consideration to which I refer in the [June 30, 2004] letter was to a proffer conducted on May 7, 2004 at the Manchester Police Department. The subject matter of our interview pertained to Mr. Gomez's knowledge of illegal drug activities in the Manchester area.

The State's alleged withholding of this purportedly exculpatory evidence and Gomez's allegedly false testimony formed the basis of the defendant's motion for a new trial, which was grounded in Part I, Article 15 of the New Hampshire Constitution, the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and RSA 526:1 (2007).

The standards that the trial court applies to a motion for new trial differ depending upon the basis for the motion. Here, the defendant argues both that the letter from Morrell to Gomez's counsel constituted exculpatory

evidence that the prosecution failed to provide, and that Gomez's assertion that he perjured himself constituted newly discovered evidence. We address each in turn.

## B. *Failure to Disclose Exculpatory Information*

■■ The defendant contends that he was denied access to exculpatory information by the State in violation of his due process rights under the United States and New Hampshire Constitutions. We first address his claim under the State Constitution, *State v. Ball*, 124 N.H. 226, 231 (1983), citing federal opinions for guidance only, *id.* at 232-33.

> Part I, Article 15 of our State Constitution provides that no citizen "shall be arrested, imprisoned, despoiled, or deprived of his property, immunities, or privileges, put out of the protection of the law, exiled or deprived of his life, liberty, or estate, but by the judgment of his peers, or the law of the land." The "law of the land" is synonymous with "due process of law." *Bragg v. Director, N.H. Div. of Motor Vehicles*, 141 N.H. 677, 678 (1997). This due process right imposes on the prosecutor the "duty to disclose evidence favorable to the accused where the evidence is material either to guilt or to punishment." *State v. Lucius*, 140 N.H. 60, 63 (1995). An investigating officer or other law enforcement official in possession of favorable evidence is subject to this same duty. *See id.*

*State v. Dewitt*, 143 N.H. 24, 33 (1998). "Generally, to secure a new trial, a defendant must prove that the prosecution withheld evidence that is favorable and material." *Id.* "If, however, the defendant establishes that the prosecution *knowingly* withheld favorable evidence, the burden shifts to the State to prove beyond a reasonable doubt that the omitted evidence would not have affected the verdict." *Id.*

■■ ■■ Thus, the defendant has the initial burden to show that the evidence withheld by the State was favorable. *State v. Shepherd*, 159 N.H. 163, 170 (2009). "Favorable evidence includes that which is admissible, likely to lead to the discovery of admissible evidence, or otherwise relevant to the preparation or presentation of the defense." *Dewitt*, 143 N.H. at 33. "Favorable evidence may include impeachment evidence." *Shepherd*, 159 N.H. at 170.

> Once the defendant proves that the evidence is favorable, the next issue is whether the State knowingly withheld the evidence. If the defendant carries this burden, there is a presumption that the evidence is material and the burden shifts to the State to prove,

beyond a reasonable doubt, that the undisclosed evidence would not have affected the verdict. *See State v. Lucius*, 140 N.H. 60, 63-64 (1995). If, however, the defendant fails to prove the State knowingly withheld the evidence, then the defendant retains the burden to prove that the evidence is material. *See Dewitt*, 143 N.H. at 35. When the defendant retains the burden to prove materiality, we apply the federal standard; *i.e.*, the defendant must demonstrate "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *[United States v.] Bagley*, 473 U.S. [667,] 682 [(1985)]; *see Dewitt*, 143 N.H. at 33.

*Shepherd*, 159 N.H. at 170-71.

■ "We initially address whether the defendant here met his burden to prove that the undisclosed information is favorable," *id.* at 171, bearing in mind that "our inquiry in this due process analysis is not whether the evidence is admissible, but instead whether it is favorable — *i.e.*, whether it would have helped the defense in the preparation or presentation of its case." *Id.*

At trial, the defense cross-examined Gomez extensively about his belief that he had received no deal on the drug charges, and attacked his sentence by implying it was inadequate in light of his criminal history and the charges he had been facing. In his closing argument, defense counsel argued that Gomez's testimony was not credible because he had received an allegedly insufficient sentence on his drug charges, and asserted repeatedly that Gomez had become part of the prosecution's "team." The letter from the Attorney General's Office to Gomez's counsel, stating that "[t]he fact that this recommendation is for a suspended sentence reflects consideration for [Gomez's] attempts to cooperate with the State," would have strengthened the defense's argument and given greater weight to its assertions that Gomez had, in fact, received a plea deal. Under these circumstances, the defendant has satisfied his burden of showing that the undisclosed evidence was favorable.

"We next consider whether the State knowingly withheld the exculpatory evidence." *Id.* The trial court found that the prosecution, represented by Attorneys David Ruoff and Charles Keefe, had not "knowingly" withheld the evidence, since they "were completely unaware of the existence of the proffer, and therefore, could not have knowingly withheld the evidence from the defendant." The court found that while the omission was potentially negligent, it did not rise to the level of "knowingly," as the term is used in the criminal context. The trial court rejected the defendant's argument that Attorney Morrell's knowledge of the existence of the proffer

letter must be imputed to Attorneys Ruoff and Keefe pursuant to *State v. Lucius*, 140 N.H. 60, 63 (1995). The trial court reasoned that the "knowingly" requirement must apply to the withholding of the evidence, not simply its existence. Since no one person in the Attorney General's Office knew not only of the existence of the evidence, but also of its value as impeachment evidence and that it was not provided to the defense, the court concluded that the prosecution had not "knowingly withheld" the evidence for burden-shifting purposes. *See State v. Laurie*, 139 N.H. 325, 330 (1995). The trial court relied on our holding in *Dewitt*, 143 N.H. at 35, where "law enforcement had the information both prior to and at trial." Despite acknowledging that it was "clear that the State withheld the evidence," we remanded for a determination of "whether the State *knowingly* withheld" it, and did not apply *Laurie*'s more stringent burden of proof. *Dewitt*, 143 N.H. at 35 (emphasis added).

 The trial court reached its decision without the benefit of our decision in *Shepherd*. There we held that a prosecution expert witness's redaction of a report constituted evidence "knowingly withheld" by the State, although the trial court's findings of fact suggested that the attorneys who prosecuted the case with the incomplete report had not become aware of its redaction until after trial. *Shepherd*, 159 N.H. at 167-68, 171. *Shepherd* is the most recent of a line of cases, of which *Dewitt* is the only outlier, imputing knowledge to the State when favorable evidence is within the control of the prosecutor or in the possession of a law enforcement agency charged with the investigation and presentation of the case. *See id.*; *Petition of State of N.H. (State v. Theodosopoulos)*, 153 N.H. 318, 320 (2006); *Lucius*, 140 N.H. at 63; *Laurie*, 139 N.H. at 327, 330; *cf. State v. Lavallee*, 145 N.H. 424, 427 (2000) (prosecutor's duty to produce exculpatory evidence extends only to evidence in prosecutor's possession or in possession of law enforcement agency charged with investigation and presentation of the case).

 Imputing knowledge among attorneys in the same office is a shorter leap than we have already taken in *Shepherd, Theodosopoulos*, and *Lucius*. Moreover, for purposes of conflicts of interest, we impute knowledge among attorneys in the same firm. *See* N.H. R. PROF. CONDUCT 1.10(a); ABA MODEL CODE OF PROF'L CONDUCT R. 1.0 cmt. [3] (2004). We consider the public defender and the appellate defender to be attorneys in the same "firm." *State v. Veale*, 154 N.H. 730, 732 (2007), *modified on other grounds by State v. Thompson*, 161 N.H. 507 (2011). The criminal division of the Attorney General's Office likewise would constitute a firm. *See* ABA MODEL CODE OF PROF'L CONDUCT R. 1.0 cmt. [3] (2004); *see also Veale*,

154 N.H. at 731 (noting that we look to the ABA Model Code Comments for guidance in interpreting our own rules of professional conduct).

Further, as noted by the defendant, there are numerous cases from other jurisdictions imputing knowledge among attorneys in the prosecutor's office. *See, e.g., Giglio v. United States*, 405 U.S. 150, 154 (1972); *Diallo v. State*, 994 A.2d 820, 837 (Md. 2010); *State v. Landano*, 637 A.2d 1270, 1287 (N.J. Super. Ct. App. Div. 1994).

█ Accordingly, we conclude that the knowledge of any attorney in the criminal bureau of the Attorney General's Office should be imputed to the State for purposes of determining whether the State "knowingly withheld" exculpatory evidence here.

█ Although no single attorney knew both that Gomez had given and received consideration on his drug charges and that he was testifying as a witness for the State in the defendant's homicide prosecution, Attorney Morrell knew of Gomez's plea bargain on his drug charges, and Attorneys Keefe and Ruoff knew both that Gomez would be an important prosecution witness in the homicide case, and that showing that he had received favorable treatment from the State would be favorable to the defense. Thus, the defendant established that the State possessed the information regarding Gomez's cooperation with the State on the drug charges. As we have concluded, the evidence of Gomez's proffer letter was favorable to the defendant. The parties agree that the State did not disclose the letter to the defendant prior to trial, so we will assume that the information was "withheld." Assuming the State knowingly withheld favorable evidence, "the burden then shifts to the State to prove, beyond a reasonable doubt, that the undisclosed evidence would not have affected the verdict.'" *Shepherd*, 159 N.H. at 171-72 (quoting *Laurie*, 139 N.H. at 330). "Not every nondisclosure is necessarily error, and a conviction need not be set aside unless a nondisclosure had an influence on the jury." *State v. Breest*, 118 N.H. 416, 419 (1978). "Materiality therefore is the key to the problem." *Id.*

"Nondisclosed, exculpatory evidence is material under the New Hampshire Constitution unless the State proves, beyond a reasonable doubt, that the undisclosed evidence would not have affected the verdict." *Lucius*, 140 N.H. at 63-64. In this case, the trial court found that, "even assuming the State knowingly withheld the evidence pertaining to the consideration Gomez apparently received for his drug charges, . . . the State has demonstrated beyond a reasonable doubt that such evidence would not have affected the verdict."

█ We have not previously stated the standard of review for such a materiality determination. The defendant contends that we should treat the

trial court's determination as a mixed question of law and fact and review it *de novo*. Because the State does not argue otherwise, we will do so in this case.

The trial court found that the undisclosed information was favorable in that it "would have served to impeach Gomez's credibility," but ultimately found that it was not material for three reasons: (1) it was "cumulative" because the defense succeeded on cross-examination of Gomez in achieving all that it could have achieved through the use of the undisclosed evidence; (2) it was not material because the defense had other avenues of impeachment by which to challenge Gomez's credibility; and (3) it was not material because Gomez's testimony was not the "primary, exclusive, or crucial evidence" of the element of premeditation.

We likewise conclude that the undisclosed evidence would not have altered defense counsel's strategy, which centered on impeachment of Gomez. We also find, beyond a reasonable doubt, that the evidence would not have altered the outcome because even if the impeachment had caused the jury to disregard Gomez's testimony altogether, there was overwhelming additional evidence of premeditation before the jury.

The defense strategy included an argument that Gomez was not a credible witness because he had, in all likelihood, received a "deal" on his drug charges. The defense questioned Gomez extensively about his belief that he had received no such deal, established the actual sentence Gomez received, and attacked the sentence by implying that it was inadequate in light of Gomez's criminal history and the charges he had been facing. The defense also argued during its closing that Gomez's testimony was not credible because he had received an insufficient sentence for his drug charges and had become part of the prosecution's "team."

The proffer letter, if disclosed, would have provided evidence that Gomez had attempted to cooperate with the State on the unrelated drug charges, and would have supported the defendant's assertion that Gomez had allegedly joined the prosecution's team. It would not have established that Gomez received any consideration for his testimony at the defendant's trial. *Cf. State v. Bader*, 148 N.H. 265, 272-73 (2002) (upholding trial court's determination of an absence of "sine qua non" on the part of the State in return for its witness's testimony and allowing cross-examination of the witness "regarding the terms and his understanding of his plea agreement, even if that understanding differed from the actual agreement").

 The defendant challenged Gomez's credibility in several additional respects. Gomez testified while wearing his New Hampshire State Prison clothing and fielded questions from both parties about the sentence he was serving at the time. He discussed his actions with regard to possessing a

firearm and hiding Lemieux's gun, the charges leading to his imprisonment, as well as the lies he had apparently told to police on prior occasions. Gomez's cooperation with the State to receive consideration in an unrelated case, therefore, was only one of the areas in which the defense attempted to discredit him, and the remaining avenues of impeachment were unaffected by the undisclosed information. *See United States v. Dumas*, 207 F.3d 11, 16 (1st Cir. 2000) ("Impeachment evidence, even that which tends to further undermine the credibility of the key Government witness whose credibility has already been shaken due to extensive cross-examination, does not create a reasonable doubt that did not otherwise exist where that evidence is cumulative or collateral."); *Breest*, 118 N.H. 421 (had evidence of the witness's deal with the State been disclosed, it would not have affected the jury's determination of the credibility or character of the witness "who had already been shown to have been a convicted criminal and anything but a pillar of society").

Furthermore, Gomez's testimony at trial, while providing some evidence of premeditation, was not the primary, exclusive, or crucial evidence of that element. *Cf., e.g., Shepherd*, 159 N.H. at 172 ("The State's case hinged on [the complaining witness's] credibility . . . . The undisclosed evidence could have led to a line of impeachment questioning that may have affected the verdict."); *Dewitt*, 143 N.H. at 34 ("The usefulness of impeachment evidence is particularly apparent in this case where only the complaining witness and the defendant have actual knowledge of the circumstances surrounding the alleged assault."); *State v. Dedrick*, 135 N.H. 502, 508 (1992) ("When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within the *Brady* rule." (quotation and brackets omitted)). Here, Gomez's credibility was not determinative of the defendant's guilt or innocence. Unlike cases, for example, in which only one officer heard an unsolicited confession, *Laurie*, 139 N.H. at 332, or a witness's testimony was the only evidence tending to show that the victim intended to kill the defendant, *Dedrick*, 135 N.H. at 509, here many witnesses testified to the events leading up to the homicide, to the circumstances of the homicide, and to the defendant's actions thereafter.

We note that the materiality standard "is not a sufficiency of evidence test," *Kyles v. Whitley*, 514 U.S. 419, 434 (1995), and in an inquiry to determine materiality, "the fact that other evidence might be sufficient to find the defendant guilty is not dispositive." *Laurie*, 139 N.H. at 332. "To determine whether the failure to disclose the evidence requires reversal, we must review the evidence in light of the role [Gomez's] testimony played in the trial, and in light of the relationsh[i]p of the evidence to the defendant's

trial strategy." *Laurie*, 139 N.H. at 332. "The absent evidence 'must be evaluated in the context of the entire record.' " *Id.* (quoting *United States v. Agurs*, 427 U.S. 97, 112 (1976)). We therefore consider the other evidence in the record to determine the effect that impeachment of Gomez by means of the undisclosed letter might have had.

■ "The elements of premeditation and deliberation require proof beyond a reasonable doubt of some reflection and consideration upon the choice to kill or not to kill, and the formation of a definite purpose to kill." *State v. Patten*, 148 N.H. 659, 660-61 (2002) (citation and quotation omitted). "While the object of the requirement is to rule out action on sudden impulse, no particular period of premeditation and deliberation is required." *State v. Elbert*, 125 N.H. 1, 12 (1984). If the amount of time has been "sufficient for some reflection and consideration . . . it matters not how brief it is." *State v. Greenleaf*, 71 N.H. 606, 614 (1902).

Even if the impeachment evidence had been disclosed and the jury had been convinced to disregard Gomez's testimony at trial, there remained overwhelming evidence of the defendant's premeditation and deliberation. Prior to the homicide, the relationship between the defendant and Lemieux was tense. Lemieux told Gobis that either the defendant or Pierre was going to kill him. Battistelli overheard the defendant and Pierre discussing that Lemieux would "get his some day." The defendant banned Lemieux from his home because of Lemieux's interaction with Jette.

The night before the murder, the defendant was upset when he learned that Lemieux had defied him by going to his apartment and had attempted to sexually assault Jennifer Hannaford, the aunt of his then-unborn child and the mother of Pierre's children. The defendant proceeded to telephone people in Manchester who might know where Lemieux could be found. Gobis testified that the defendant and Lemieux had argued on the telephone, and that Lemieux told her that the defendant "threatened to kill him."

Garcia testified that on the day of the shooting, the defendant was upset and angry, and that the defendant had lied to Lemieux about when they would be arriving at Central Street because he wanted to get there before Lemieux did. Garcia further testified that the defendant had asked Gomez to go to Central Street. The defendant retrieved his .9-millimeter Ruger pistol, Pierre obtained a gun and Rivera gave Pierre bullets. The men behaved as though they expected a fight: Pierre told Jennifer Hannaford to take the children upstairs shortly before the murder, and Roux was reluctant to go outside to meet Lemieux.

Garcia testified that the defendant had been holding the gun in his left hand when Lemieux arrived, that he moved the gun to his right hand, said

something to Pierre in Haitian Creole, and then moved behind Lemieux and shot him. Johnson and Rivera both also testified that the defendant moved behind Lemieux, pointed the gun at him, and then shot him. The medical examiner testified that the bullet severed Lemieux's spinal cord and immediately ended his life.

The record also contained letters the defendant had written in which he told Amy Hannaford and Jette that he had known that Lemieux was going to be killed. Detective John Patti testified, without objection, that in February 2004, Gomez told Detective Patti that Gomez and the defendant had discussed bringing Lemieux to Foxwoods for a "wood ride," meaning they would murder Lemieux during the ride, and that the defendant had said, "It's a wrap," meaning that Lemieux was going to be killed.

■ The jury was thus presented with overwhelming evidence, aside from Gomez's testimony, that the defendant purposely, with deliberation and premeditation, killed Lemieux. *See Elbert*, 125 N.H. at 12. The State has shown beyond a reasonable doubt that disclosure of Gomez's immunity agreement and plea deal in the other cases would not have affected defense counsel's strategy or the ultimate verdict.

Because the record supports the trial court's finding that "while Gomez's testimony may have bolstered the State's case, it was not of such a nature that further impeachment by the proffer letter would have altered the result," we affirm the trial court's denial of the defendant's motion for new trial based on the State's alleged failure to disclose exculpatory information. In light of the fact that the State Constitution affords greater protection than does the Federal Constitution, *see Laurie*, 139 N.H. at 330, we reach the same result under the Federal Constitution.

### C. Gomez's Alleged Perjury

The defendant asserts that he is entitled to a new trial on the basis that Gomez's testimony was perjured, both as to his plea bargain with the State and, more broadly, as to his testimony inculpating the defendant. The defendant's arguments are based both in the discovery of "new evidence," namely, Gomez's post-trial statement that he had committed perjury, and in the nondisclosure of the evidence refuting Gomez's statements that he was not testifying pursuant to a deal with the State. The State responds that Gomez did not commit perjury, and even if Gomez's testimony was not truthful, his false statements were not material. The trial court agreed with the State, finding that Gomez had not lied as to whether he received consideration from the State, that his testimony reflected only his "discontent with the sentence he did receive," and that, even if he had testified falsely, his false statements were not material.

██ We first note the different standards applicable to the State's knowing use of perjured testimony and its unwitting use of such testimony. If the State's use of any perjured information was knowing, then the test is that set forth in *Laurie*, as discussed above; if, however, the State unwittingly presented perjured testimony, and the testimony was discovered to be false after trial, then the test is the one applicable to any motion based upon newly discovered evidence. *See United States v. Connolly*, 504 F.3d 206, 211-13 (1st Cir. 2007) (comparing the federal standard for a motion for new trial based upon newly discovered evidence with the more defense-favorable standard when exculpatory evidence has been withheld); *United States v. Huddleston*, 194 F.3d 214, 217 (1st Cir. 1999) (holding where prosecutor's use of perjurious testimony was unwitting, a motion for a new trial "should be treated in the same manner as any other newly discovered evidence"); *Bader*, 148 N.H. at 284-85 (distinguishing *State v. Yates*, 137 N.H. 495 (1993), since "[t]hat case provides that a new trial is warranted where the prosecution knowingly presented false or perjured testimony [and t]here is no basis for such a conclusion in this case").

██ The authority for granting a new trial based upon newly discovered evidence is statutory. RSA 526:1 provides: "A new trial may be granted in any case when through accident, mistake or misfortune justice has not been done and a further hearing would be equitable."

> It is well settled that the questions involved in an application for a new trial are questions of fact entirely within the jurisdiction of the superior court. Accordingly, we will not overturn the trial court's determination of whether a new trial should be granted in a particular case unless there has been an [unsustainable exercise of discretion].

*State v. Jaroma*, 139 N.H. 611, 613 (1995) (quotation omitted); *see Lambert*, 147 N.H. at 296 (explaining unsustainable exercise of discretion standard).

> To prevail on a motion for a new trial based upon newly discovered evidence, the defendant must prove: (1) that he was not at fault for failing to discover the evidence at the former trial; (2) that the evidence is admissible, material to the merits and not cumulative; and (3) that the evidence is of such a character that a different result will probably be reached upon another trial.

*State v. Cossette*, 151 N.H. 355, 361 (2004) (citations omitted). "Recanted testimony is a species of newly discovered evidence for purposes of a new trial motion." *Bader*, 148 N.H. at 282 (quotation omitted).

"The question of whether a new trial should be granted on the basis of newly discovered evidence is a question of fact for the trial court." *State v. Williams*, 142 N.H. 662, 668 (1998) (quotations omitted). "We will sustain the trial court's decision unless it conclusively appears that a different result is probable, so that the Trial Court's conclusion is clearly unreasonable." *Id.* (quotation omitted). Moreover,

> It is a question of fact for the trial court as to whether newly discovered evidence suggesting perjury by a prosecution witness demands a new trial. Where the overriding question is the possible impact of newly discovered evidence on the credibility of a key prosecution witness, we must affirm the findings of the trial court so long as there is evidence to support them.

*Bader*, 148 N.H. at 283 (quotation omitted).

In this case, the evidence suggesting perjury beyond the plea information stems from Gomez's conversation with Kathy Tinklepaugh, an investigator working with the public defender on the defendant's case. Tinklepaugh testified that Gomez told her that "perjury was done" and that "[h]e was asked to do it." She further testified that Gomez had conversed with the defendant about Gomez's testimony after the defendant's conviction, and that Gomez was coming forward because "he wanted to make it right," clarifying that "[the defendant] may have done it but he didn't do it the way they wanted people to see it." The defendant argues that, since Gomez spoke of how the defendant "may have done it," Gomez's admission of perjury referred to testimony about Lemieux's killing, and, since Gomez was not present at the shooting, his perjury related to his incriminating testimony about the defendant's premeditated plan to kill Lemieux.

As to the circumstances of the shooting, the trial court found no false testimony by Gomez, noting that his testimony had been consistent from mere weeks after the shooting through the time of the trial, and was substantially corroborated by letters written by the defendant himself and by the testimony of other witnesses. The trial court further noted, "It is apparent from the police reports that Gomez testified at trial because the defendant had threatened his family," and found Gomez's credibility bolstered by his admissions of lying to police regarding his possession of a gun and the act of hiding Lemieux's gun. It also noted that, following the trial, Gomez considered the defendant his "little brother," as evidenced in letters between Gomez and the defendant. The court found that Gomez had not committed perjury but that, "even assuming Gomez committed perjury at trial, . . . the defendant has not demonstrated that Gomez's perjured testimony would have affected the outcome of the trial." The record supports the trial court's findings and conclusions.

When the purported new evidence is a recantation by a prosecution witness, the third prong of the three-prong test applicable to newly discovered evidence will not be met if the trial judge finds as a threshold matter that the recantation is not credible. *State v. Mills*, 136 N.H. 46, 51 (1992); *see also People v. Minnick*, 263 Cal. Rptr. 316, 318 (Ct. App. 1989) (in deciding motion for new trial based upon recantation, trial judge determines whether new evidence is credible, then whether different result on retrial is probable). The trial judge here found that Gomez had not committed perjury, noting that he had "on multiple occasions, provided virtually the same story regarding the homicide." Furthermore, the court noted, "his trial testimony was corroborated by multiple other pieces of evidence, including letters written by the defendant himself and the testimony of other witnesses." The record supports the trial court's determination as to Gomez's original account, and thus, its skepticism as to his recantation. *See Connolly*, 504 F.3d at 214 ("It is well established that recantations are generally viewed with considerable skepticism.")

In addition, Gomez's "testimony at trial was also corroborated by several other witnesses, mitigating the significance of any possible recantation." *United States v. Walker*, 25 F.3d 540, 549 (7th Cir. 1994); *see also Connolly*, 504 F.3d at 217 n.6 ("[T]he force of impeachment evidence is diminished when the witness's testimony is supported by substantial corroborating evidence."). Thus, Gomez's "recantation, like many jailhouse recantations, lacked any meaningful indicia of reliability and, therefore, was properly regarded as highly suspicious." *Connolly*, 504 F.3d at 215 (quotations omitted). We also consider the fact that "no evidence has been presented suggesting that [Gomez] himself would be willing, under oath, to admit to perjury." *Id.* at 216.

Even assuming that the recantation was credible, it was not "of such a character that a different result will probably be reached upon another trial." *Cossette*, 151 N.H. at 361.

> We do not believe that due process demands a hearing to determine the credibility of every recantation of testimony. Only recantations of material testimony that would most likely affect the verdict rise to the level of a due process violation, if a state, alerted to the recantation, leaves the conviction in place.
>
> . . . .
>
> It is our belief that the perjured testimony which will trigger a due process violation must be of an extraordinary nature. It must

leave the court with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.

*Bader*, 148 N.H. at 286 (quotation and brackets omitted). "For newly discovered evidence to warrant a retrial in a criminal case, the existence of the required probability of reversal must be gauged by an objectively reasonable appraisal of the record as a whole, not on the basis of wishful thinking, rank conjecture, or unsupportable surmise." *United States v. Natanel*, 938 F.2d 302, 314 (1st Cir. 1991). As we discussed above, the evidence presented to the jury, even in the absence of Gomez's trial testimony, overwhelmingly supported a finding of guilt beyond a reasonable doubt. *See Connolly*, 504 F.3d at 216-17 ("[E]ven assuming that the recantation were true, it would not prove very much. . . . [The witness's alleged recantation] gave no indication that the appellant was innocent of the charged crimes. In this sense, his recantation, if believed, would merely be impeaching and, consequently, would have a limited effect upon the outcome of a new trial in which substantial corroborating testimony existed."). Under these circumstances, it was not unreasonable or untenable for the trial court to conclude that the purported new evidence was not of a character that would alter the result upon retrial, and we therefore affirm that decision.

### D. Failure to Grant Immunity to Gomez

Finally, the defendant argues that the trial court erred by failing to compel the State to immunize Gomez in order to learn the extent of his purportedly exculpatory testimony, thus violating the defendant's due process rights under Part I, Article 15 of the New Hampshire Constitution and the Fifth and Fourteenth Amendments to the United States Constitution. "We analyze the defendant's due process claim under our State Constitution, and reference federal case law only to aid in our analysis." *State v. Kivlin*, 145 N.H. 718, 721 (2001) (quotation omitted). Because our analysis above is dispositive of this claim, we will be brief.

 Although "situations could arise in which to deny immunization from prosecution would deprive a defendant of due process on the facts of his case," *State v. Rogers*, 159 N.H. 50, 57 (2009) (quotation and brackets omitted), in order to establish a due process violation, the defendant must meet a two-part test:

First, "no such violation will be recognized . . . without a showing by the defendant that the testimony sought would be directly exculpatory or would present a highly material variance from the

tenor of the State's evidence." *State v. Monsalve*, 133 N.H. 268, 270 (1990). Second, "if the defendant demonstrates that his case falls within these narrow circumstances, we then decide whether, on the facts of the defendant's case, the executive branch's refusal to immunize a defense witness denied the defendant a fair trial." *Kivlin*, 145 N.H. at 721 (quotation and ellipses omitted).

*Rogers*, 159 N.H. at 57 (brackets omitted).

The first part of our analysis, whether the proffered testimony was directly exculpatory or of a highly material variance, requires the defendant to meet a high burden. In conducting our review, we look to whether the proffered testimony would have prevented the defendant's conviction. *Kivlin*, 145 N.H. at 722; *State v. MacManus*, 130 N.H. 256, 259 (1987); *see Blissett v. Lefevre*, 924 F.2d 434, 441-42 (2d Cir. 1991) (stating defendant must make showing that the testimony is material, exculpatory and not cumulative, as well as that he cannot obtain the evidence from another source), *cert. denied*, 502 U.S. 852 (1991). Furthermore, a variance from the tenor of the State's evidence is only "highly material" when the variance is irreconcilable with the State's case. *State v. Winn*, 141 N.H. 812, 816 (1997).

*Id.* at 58.

The trial court concluded that "even if Gomez committed perjury at trial and his entire testimony is excised, there was a wealth of evidence from which the jury reasonably could have found premeditation and deliberation." We agree.

■ Regardless of what Gomez would have testified to, in light of the other evidence of the defendant's guilt, he could not have offered "the sort of exculpatory evidence that would have prevented the defendant's conviction," *Rogers*, 159 N.H. at 58. Even a complete recantation by Gomez "could not place the defendant elsewhere or preclude the possibility that the defendant" committed the crime of which he was convicted. *Id.* Thus, we conclude that the trial court's decision not to grant Gomez immunity for the purpose of investigating his purported perjury did not violate the defendant's due process rights under the State Constitution. As the State Constitution provides at least as much protection as the Federal Constitution under these circumstances, *see Kivlin*, 145 N.H. at 721, we reach the same result under the Federal Constitution.

*Affirmed.*

DUGGAN, HICKS and LYNN, JJ., concurred; DALIANIS, C.J., concurred in part and dissented in part.

DALIANIS, C.J., concurring in part and dissenting in part. Because I believe that the trial court erred in instructing the jury regarding the amount of force the defendant was permitted to use in self-defense or defense of others, I respectfully dissent from Part II(A) of the majority's thoughtful opinion. I concur, however, in the remainder of the opinion.

The trial court instructed the jury, in pertinent part, as follows:

> The defendant must reasonably believe that the amount of force he used was necessary for self-defense or defense of others. A person is not permitted to use excessive force in self-defense, only a reasonable amount of force. The defendant can use the amount of force which he believed was necessary under the circumstances as long as, at the time, there were reasonable grounds for his belief.

The circumstances, relevant to this case, under which deadly force may be used are set forth in RSA 627:4, II (2007):

> A person is justified in using deadly force upon another person when he reasonably believes that such other person:
>
> (a) Is about to use unlawful, deadly force against the actor or a third person . . . .

At the time of the events at issue in this case, RSA 627:4, III (2007) (amended 2011) set forth the following limitations upon the use of deadly force:

> A person is not justified in using deadly force on another to defend himself or a third person from deadly force by the other if he knows that he and the third person can, with complete safety:
>
> (a) Retreat from the encounter, except that he is not required to retreat if he is within his dwelling or its curtilage and was not the initial aggressor; or
>
> (b) Surrender property to a person asserting a claim of right thereto; or
>
> (c) Comply with a demand that he abstain from performing an act which he is not obliged to perform; nor is the use of deadly force justifiable when, with the purpose of causing death or

serious bodily harm, the actor has provoked the use of force against himself in the same encounter.

(d) If he is a law enforcement officer or a private person assisting him at his direction and was acting pursuant to RSA 627:5, he need not retreat.

In contrast, with regard to non-deadly force, RSA 627:4, I (2007) provides, in pertinent part:

A person is justified in using non-deadly force upon another person in order to defend himself or a third person from what he reasonably believes to be the imminent use of unlawful, non-deadly force by such other person, and he may use a degree of such force which he reasonably believes to be necessary for such purpose.

Deciding whether the trial court's instructions were erroneous requires us to construe RSA 627:4. The interpretation of a statute is a question of law, which we decide *de novo*. *State v. McKeown*, 159 N.H. 434, 435 (2009). In matters of statutory interpretation, we are the final arbiter of the intent of the legislature as expressed in the words of a statute considered as a whole. *Id*. We construe the Criminal Code according to the fair import of its terms and to promote justice. RSA 625:3 (2007). In doing so, we must first look to the plain language of the statute to determine legislative intent. *McKeown*, 159 N.H. at 435. Absent an ambiguity we will not look beyond the language of the statute to discern legislative intent. *Id*. Our goal is to apply statutes in light of the legislature's intent in enacting them, and in light of the policy sought to be advanced by the entire statutory scheme. *Id*. Accordingly, we interpret a statute in the context of the overall statutory scheme and not in isolation. *Id*. at 436.

The language of the statute, I believe, is plain and unambiguous. The use of the word "necessity" in the non-deadly force provision shows that the legislature knows how to include a "necessity" requirement when it intends to do so. *See Correia v. Town of Alton*, 157 N.H. 716, 719 (2008). By not including a "necessity" requirement in the deadly force provisions, the legislature unambiguously provided that such a requirement does not apply when a person is faced with the use of deadly force against him. We should not impose such a requirement, for to do so would be to add words that the legislature did not see fit to include. *See State v. Villeneuve*, 160 N.H. 342, 347 (2010) (court will not add words that the lawmakers did not see fit to include). Furthermore, we can be confident that the legislature considered the issue of limitations upon the use of defensive deadly force because it specifically listed the limitations it intended to apply in RSA 627:4, III. Its

failure to include a necessity limitation further demonstrates its intent that no such limitation apply, for "[n]ormally the expression of one thing in a statute implies the exclusion of another." *Appeal of Campaign for Ratepayers' Rights*, 162 N.H. 245, 251 (2011) (quotation omitted). The force of this familiar canon of statutory construction is strengthened when, as here, the limitation at issue was included in one part of the statute but omitted in another. *City of Manchester v. Sec'y of State*, 161 N.H. 127, 133 (2010).

The majority contends that the statute is susceptible of at least two reasonable interpretations, but fails to identify any ambiguous language in the statute that would support its position. Rather, it relies upon canons of statutory construction, legislative history, and public policy grounds to impose an additional limitation upon the defensive use of deadly force that appears nowhere in the statutory language. This is contrary to our well-established rule that absent an ambiguity, we will not look beyond the language of the statute to discern legislative intent. *See, e.g., McKeown*, 159 N.H. at 435.

Moreover, even if I agreed that we should look beyond the statute's plain language, in my opinion, the legislative history does not support the majority's analysis. Although the majority notes that the Model Penal Code commentary supports the State's interpretation in this case, it fails to address the fact that the legislature specifically declined to adopt the very language of the Model Penal Code that does so.

RSA 627:4 (2007 & Supp. 2010) (amended 2011) was adopted in 1971 as part of the revision of the Criminal Code, Laws 1971, 518:1.

> The revised Criminal Code was recommended by the Commission to Recommend Codification of Criminal Laws (Commission), which was created by legislative directive in 1967. Laws 1967, ch. 451. In April 1969, the Commission, chaired by Chief Justice Frank R. Kenison, issued the Report of Commission to Recommend Codification of Criminal Laws (Report) providing a comprehensive draft revised Criminal Code, *see* REPORT at iv, and included comments that detail the source of the recommended language for each draft section, *see, e.g., id.* at iii.

> In the Report, the Commission identified its "basic aim" as "produc[ing] a more concise and simplified criminal law than now applies in this state." *Id.* at iv; *see also* N.H.S. JOUR. 1641-42 (1971). In performing this task, the Commission reviewed draft laws and comments from a wide variety of sources, but "found especially useful the Model Penal Code, the Michigan Revised Criminal Code, Final Draft — September 1967, and the New York Penal Law, 1967." REPORT, *supra* at iii.

*State v. Kousounadis*, 159 N.H. 413, 424-25 (2009).

Thus, the Commission had before it MODEL PENAL CODE § 3.04, which provides in relevant part:

> **(1) Use of Force Justifiable for Protection of the Person.** Subject to the provisions of this Section and of Section 3.09, the use of force upon or toward another person is justifiable when the actor believes that *such force is immediately necessary* for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.
>
> **(2) Limitations on Justifying Necessity for Use of Force.**
>
> . . . .
>
> (b) The use of deadly force is not justifiable under this Section unless the actor believes that *such force is necessary* to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat . . . .

MODEL PENAL CODE § 3.04 (1985) (emphasis added). As the emphasized language makes clear, the Model Penal Code requires that the amount of force used in response to *both* non-deadly force and deadly force must be "necessary." The Commission did not adopt the Model Penal Code language, however. Instead, it recommended the following, in pertinent part:

**572:4 Physical Force in Defense of a Person.**

> I. A person is justified in using non-deadly force upon another person in order to defend himself or a third person from what he reasonably believes to be the imminent use of unlawful, non-deadly force by such other person, and he may use a degree of such force which he reasonably believes to be necessary for such purpose. . . .
>
> II. A person is justified in using deadly force upon another person when he reasonably believes that such other person is about to use unlawful, deadly force against the actor or a third person, or is likely to use any unlawful force against the occupant of a dwelling while committing or attempting to commit a burglary of such dwelling, or is committing or about to commit kidnapping or a forcible sex offense. . . .

REPORT, *supra* at 20. This language reflects the distinction seen in the statute before us today — the actor must believe that the degree of

defensive non-deadly force employed is "necessary" to defend himself or a third person from the use of unlawful non-deadly force, while the use of defensive deadly force against the use of unlawful, deadly force is not so limited. The comments of the Commission reveal that it chose not to adopt the Model Penal Code's language, that it intentionally made distinctions between the use of deadly force and non-deadly force, and that it was fully aware that the explicit "necessity" limitation on the amount of force applied only to the use of non-deadly force:

> This section is a modification of § 615 of the Michigan Revised Criminal Code, Final Draft, and undertakes to clarify and articulate the law relating to self-defense as well as the circumstances in which force may be used against another even in the absence of some aggression against the actor. Distinctions are made between the use of deadly and non-deadly force, terms which are defined in section 572:9.

> Both sorts of force may be used in defense of a third person as well as in defense of the actor. Paragraph I provides the general rule that in order to repel *unlawful and non-deadly force an amount of force necessary for the purpose may be used.* The provisions of I(a)-(c) deal with situations where it would generally be agreed that the general rule ought not to apply.

> The use of deadly force is governed by broader criteria than preservation of the actor or a third person. Paragraph II sanctions its use to prevent kidnapping or a forcible sex offense and against burglars who are likely to use *any* personal violence. Paragraph II(a)-(d) deals with rules concerning limitations on the defensive use of deadly force. . . .

REPORT, *supra* at 20-21 (first emphasis added). Accordingly, the legislative history demonstrates that language that would have imposed a "necessity" requirement upon the use of deadly force to defend against deadly force was considered and rejected by the Commission. Instead the Commission, and the legislature thereafter, adopted language imposing such a limitation only upon the use of non-deadly force to defend against non-deadly force. Thus, the legislative history demonstrates that the plain language of the statute accords with the legislature's intent.

The majority looks to the common law to support its position, noting that we have often stated that we will not interpret a statute to abrogate the common law "unless the statute clearly expresses that intent." *State v. Elementis Chem.*, 152 N.H. 794, 803 (2005) (quotation omitted). For the

reasons set forth above, even if I were to apply this canon of statutory construction, I would conclude that the statute "clearly expresses that intent." Furthermore, it is axiomatic that the purpose of canons of statutory construction is to divine legislative intent. Where, as here, the legislative history clearly reveals the legislature's intent, I see no need to consider this canon.

The majority also contends that when there is doubt about the meaning or intent of a statute, effect should be given that makes the least change to the common law. *See* 3 N. SINGER & J.D. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 61.1, at 314 (7th ed. 2008). I agree that we have looked to the common law in the past to construe an ambiguous statutory term, *see, e.g., State v. Pugliese*, 120 N.H. 728, 731 (1980) (court looked to common law in deciding whether the term "dwelling" in the self-defense statute includes curtilage), as well as when a literal reading of the self-defense statute led to an absurd result, requiring us by necessity to construe the statute other than in accord with its plain language, *see State v. Warren*, 147 N.H. 567, 569 (2002). In my view, however, neither these cases nor the canons of statutory construction relied upon by the majority support engrafting onto the statute a limitation from the common law that the legislature chose not to include. Such action could be justified *only* if the plain language of the statute led to an absurd result — but it does not, and the majority does not contend otherwise. As the defendant argues in his brief:

> RSA 627:4, II(a) permits the use of deadly force in defense of self or another only when the actor reasonably believes that an attacker "is about to use unlawful, deadly force." To require in addition that the actor use non-deadly force unless deadly force is necessary to avoid the danger would demand a complicated mental calculation under highly stressful and urgent conditions. Under such a rule, the actor not only must reasonably ascertain whether the attacker is about to use deadly force, but also must contemplate the range of possible responses and select an effective, non-deadly option. The legislature could reasonably choose not to require that second calculation.

Because the plain language of the statute does not lead to an absurd result, I believe that we should not stray from the plain meaning of the words used by the legislature. *See Warren*, 147 N.H. at 568.

Next, the majority relies upon the legislature's actions in the wake of *Warren*, stating that it has amended RSA 627:4 twice "and the amendments did not vitiate our holding that the deadly force provision implicitly required reasonable necessity." The holding of *Warren*, however, as stated

in the opinion itself, was simply that "RSA 627:4, II(d) does not justify the use of deadly force against an assailant when the assailant is a cohabitant of the home." *Id.* at 572. At issue in *Warren* was the use of *deadly force* against an assailant using only "unlawful force" in the defendant's dwelling. *Id.* at 568. We concluded "that a person is not entitled to use *deadly* force to repel a *non-deadly* attack in the person's home where the assailant is a cohabitant." *Id.* at 571. Thus, the legislature's failure to "vitiate" the holding of *Warren* at most supports the conclusion that the legislature agrees that deadly force may not be used to repel a non-deadly attack by a cohabitant in the person's dwelling. This tells us nothing about the legislature's view on the issue presented by this case, which involves the use of deadly force to repel a deadly attack.

Finally, I note that it is "the province of the legislature to enact laws defining crimes." *State v. Rix*, 150 N.H. 131, 134 (2003) (quotation omitted). The legislature has determined that "[n]o *conduct* or omission constitutes an offense unless it is a crime or violation under [the Criminal Code] or under another statute." RSA 625:6 (2007) (emphasis added). When self-defense or defense of others is raised as a justification, it becomes a material element of the charged offense. RSA 625:11, IV (2007). By creating a necessity requirement that does not appear in the statute, the majority has taken conduct that would not constitute an offense under the Criminal Code as written, and made it criminal. While it may be necessary for this court to construe Criminal Code provisions contrary to their plain meaning when the literal language of the statute leads to an absurd result, *see Warren*, 147 N.H. at 568, the majority admits that interpreting the statute in this case in accordance with its plain language is "reasonable." Accordingly, I would hold that the trial court erred in its instructions to the jury regarding the amount of force the defendant was permitted to use in defense of self or others.