Rockingham
No. 2013-869

THE STATE OF NEW HAMPSHIRE

v.

JOSIAH MAYO

Argued: November 12, 2014
Opinion Issued: February 20, 2015

*Joseph A. Foster*, attorney general (*Susan P. McGinnis*, senior assistant attorney general, on the brief and orally), for the State.

*Mulvey, Cornell & Mulvey*, of Portsmouth (*Patrick A. Mulvey* on the brief and orally), for the defendant.

LYNN, J. The defendant, Josiah Mayo, appeals his convictions, following a jury trial, of first degree assault with a deadly weapon, *see* RSA 631:1, I(b) (Supp. 2014), and reckless second degree assault, *see* RSA 631:2, I(a) (Supp. 2014).[1] On appeal, he argues that the Superior Court (*Delker*, J.) erred by: (1) failing to instruct the jury that his use of force in defense of his cousin was justified if he reasonably believed that his cousin was not the initial aggressor or provoker; (2) denying his motion to dismiss the first degree assault charge on the grounds that his shod foot could not constitute

---

[1] The second degree assault charge was brought as an alternative to the first degree assault charge. Therefore, upon the defendant's conviction on both charges, the court did not impose a sentence on the second degree assault charge, instead holding it in abeyance to await the outcome of this appeal. Because the trial court's jury instruction error affected both charges, we reverse both convictions and remand for a new trial on both charges.

a deadly weapon under RSA 625:11, V (2007); and (3) allowing the admission of evidence of the defendant's prior convictions for impeachment purposes. We reverse and remand.

## I

The jury could have found the following facts. On the evening of July 14, 2012, the defendant and his cousin, Daniel Mayo, were in Portsmouth at The Page, a restaurant and bar. They left at around 12:30 a.m. and went their separate ways, with plans to meet later at another area restaurant. The victim and his friends Kevin Donahue, Robert Yitts, Jacob Losik, William Ryan Paris, and Charles "Costa" McCreed were also at The Page that night. The victim, Zachary Green, had consumed three alcoholic beverages earlier in the day but did not drink any more that evening because he was the designated driver. Most of the victim's friends had consumed alcohol throughout the evening, some to the point of intoxication.

Shortly before closing time at 1:00 a.m. on July 15, the bouncers at The Page began moving patrons outside into the adjacent alleyway known as the Vaughan Mall (Mall), an area that often became very crowded with people leaving other area establishments. The defendant testified that at around 1:00 a.m. he was walking through the Mall. The victim and his friends were leaving The Page around the same time, and also ended up in the Mall.

Various witnesses testified about what next occurred. Donahue testified that "small scuffles started to break out," during which he was hit in the head and kicked in the leg. When he turned around to determine who had hit him, he "saw a bunch of angry faces and people ready to fight." Donahue testified that he saw Paris get punched in the side of the head and Losik get knocked to the ground.

Paris testified that "a black gentleman . . . was upset" with one of his friends: the man was yelling and "seemed like he was trying to make a move like he was going to go fight them or something like that." Paris tried to de-escalate the situation by standing in front of the man and stating that no one wanted any trouble. In response, the man told Paris to "get out of his face and things of that sort" and, during that exchange, the man's hand came into contact with Paris. Then, according to Paris, the man stated, "don't f'ing touch me," and punched Paris in the face. The victim then came over to Paris and held his hands up, saying "whoa, whoa, whoa," at which point another man kicked the victim in the face.

Losik testified that he had seen Paris talking to two men, and that soon thereafter Paris was punched in the face. When Losik approached Paris, the same two men pushed Losik to the ground. Losik got up and walked away from the two men to join his group of friends. At that point he saw the

victim walking toward Paris and some words were spoken between the victim and the two men. The next thing Losik saw was the victim "on the ground."

The victim testified that, upon leaving The Page, he started to walk through the Mall toward the parking lot where he had parked his car. At that time he was with Donahue, and the rest of his friends were nearby. At some point the victim noticed Yitts and two men "looking funky at one another," as in "not happy." The two men appeared to be mad, and so the victim "immediately tried to get [Yitts] to go walk away." He told Yitts that they were not going to fight, and pointed him toward the car. The victim then turned back around and "scolded" the two men for acting immature, telling them "to grow up and we're not fighting." He testified that the next thing he remembered was waking up in the hospital.

The defendant testified that as he was walking through the Mall, he heard the word "n....r." When he turned around, he noticed his cousin Daniel and a group of individuals. As he got closer, "something happened, and people just kind of converged on [his cousin]," "limbs were flying," and his cousin was "physically assaulted." He testified that hearing people yell racial slurs and seeing the group of individuals converge on his cousin made him believe that his "cousin was in danger at that time." When he was approximately three or four feet away from the group, the defendant noticed the victim approaching from his right "fairly quickly" and assumed that he was going after his cousin. The defendant responded by kicking the victim.

The witnesses agreed that the defendant kicked the victim once in the face. As a result of the kick, the victim was immediately rendered unconscious and fell, hitting his head on the pavement. The victim was transported to the hospital, where he was diagnosed with a concussion, a skull fracture, and an inter-cranial hemorrhage. The defendant was subsequently arrested and charged, alternatively, with first degree assault with a deadly weapon and reckless second degree assault. At trial, the defendant claimed that he acted in defense of his cousin. After a four-day trial, the defendant was convicted on both charges. This appeal followed.

## II

■ The defendant first contends that the trial court erred by failing to instruct the jury that his use of force in defense of his cousin was justified if he reasonably believed that his cousin was not the initial aggressor or provoker of a physical encounter with the victim and his friends. "The purpose of the trial court's charge is to state and explain to the jury, in clear and intelligible language, the rules of law applicable to the case." *State v. Etienne*, 163 N.H. 57, 70 (2011) (quotation omitted). "When reviewing jury

instructions, we evaluate allegations of error by interpreting the disputed instructions in their entirety, as a reasonable juror would have understood them, and in light of all the evidence in the case." *Id.* (quotation omitted). "We determine whether the jury instructions adequately and accurately explain each element of the offense and reverse only if the instructions did not fairly cover the issues of law in the case." *Id.* "Whether a particular jury instruction is necessary, and the scope and wording of jury instructions, are within the sound discretion of the trial court, and we review the trial court's decisions on these matters for an unsustainable exercise of discretion." *Id.* (quotation omitted). "To show that the trial court's decision is not sustainable, the defendant must demonstrate that the court's ruling was clearly untenable or unreasonable to the prejudice of his case." *Id.* (quotation omitted). "However, the interpretation of a statute is a question of law, which we review *de novo.*" *Id.* (quotation omitted).

The trial court instructed the jury as follows:

> The defendant is not justified in using force if he or [a] third person was the initial aggressor, unless after such aggression he and the other person withdraw from the encounter and effectively communicate to the assailant their intent to do so, but the assailant notwithstanding continues the use [of] or threaten[s] unlawful force.

> The defendant does not have the right to use force to defend another if he or the person he was defending provoked the use of force . . . .

> The defendant was not required to retreat if he had a right to be in the location where the use of force occurred and, if he or the person he was defending was not the one who started the encounter.

The defendant asserts that this instruction was erroneous because it required the defendant to be factually correct that his cousin was not the initial aggressor or provoker in order for his use of force to be justified, which he argues is an incorrect statement of the law. He contends that the trial court should have instructed the jury that he was justified in using force if he had an honest and reasonable belief that his cousin was not the initial aggressor or provoker. The defendant argues that, under the court's instruction, if the jury believed that his cousin was the initial aggressor or provoker, it would have been required to conclude that his actions were not justified without considering either his subjective state of mind or the reasonableness thereof. Because the improper instructions precluded the jury from reaching these issues, the defendant claims that the State was

relieved of its burden to disprove the defense beyond a reasonable doubt, a defect which he asserts amounts to structural error.

The State responds that such "reasonable belief" language regarding the third person's status as the initial aggressor or provoker is inconsistent with the plain language of the defense-of-others statute, *see* RSA 627:4 (Supp. 2014), and the common law "alter-ego rule," under which the defendant "steps into the shoes" of the third person (here, his cousin) with regard to whether the use of force is justifiable. The State further argues that the legislature considered the Model Penal Code (MPC) when drafting RSA 627:4, but that its failure to adopt the MPC's exact language left the alter-ego rule intact. The State also argues that, even if the instruction was erroneous, the error was neither structural nor prejudicial in nature and, thus, does not warrant reversal of the defendant's convictions.

"Resolving this dispute requires that we interpret pertinent Criminal Code provisions." *Etienne*, 163 N.H. at 71 (quotation omitted). "The interpretation of a statute is a question of law, which we decide *de novo.*" *Id.* (quotation omitted). "We construe the Criminal Code according to the fair import of its terms and to promote justice." *Id.* (quotations and brackets omitted); *see* RSA 625:3 (2007). "In doing so, we must first look to the plain language of the statute to determine legislative intent." *Etienne*, 163 N.H. at 72 (quotation omitted). "We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include." *Appeal of Local Gov't Ctr.*, 165 N.H. 790, 804 (2014). "Absent an ambiguity we will not look beyond the language of the statute to discern legislative intent." *Etienne*, 163 N.H. at 72 (quotation omitted). "Our goal is to apply statutes in light of the legislature's intent in enacting them, and in light of the policy sought to be advanced by the entire statutory scheme." *Id.* (quotation omitted). "Accordingly, we interpret a statute in the context of the overall statutory scheme and not in isolation." *Id.* (quotation omitted).

RSA 627:4 sets forth the circumstances under which a person is justified in using physical force in defense of a person. It states, in pertinent part:

> I. A person is justified in using non-deadly force upon another person in order to defend himself *or a third person* from what he reasonably believes to be the imminent use of unlawful, non-deadly force by such other person, and he may use a degree of such force which he reasonably believes to be necessary for such purpose. However, such force is not justifiable if:
>
>> (a) With a purpose to cause physical harm to another person, he provoked the use of unlawful, non-deadly force by such other person; or

(b) He was the initial aggressor, unless after such aggression he withdraws from the encounter and effectively communicates to such other person his intent to do so, but the latter notwithstanding continues the use or threat of unlawful, non-deadly force . . . ;

. . . .

II. A person is justified in using deadly force upon another person when he reasonably believes that such other person:

(a) Is about to use unlawful, deadly force against the actor *or a third person*;

. . . .

III. A person is not justified in using deadly force on another to defend himself or herself *or a third person* from deadly force by the other if he or she knows that he or she *and the third person* can, with complete safety:

(a) Retreat from the encounter, except that he or she is not required to retreat if he or she is within his or her dwelling, its curtilage, or anywhere he or she has a right to be, and was not the initial aggressor . . . .

RSA 627:4 (emphasis added).

Paragraph I states that "a person" — here, the defendant — is justified in defending himself or a third person from what he reasonably believes to be the imminent use of unlawful, non-deadly force by another person. RSA 627:4, I. The statute contains an additional requirement: the degree of force he uses must be that which "he reasonably believes to be necessary for such purpose." *Id.* This paragraph makes clear, by its use of the phrase "or a third person," that the basic reasonableness requirements regarding imminent, unlawful force and the degree of force necessary apply to both the defendant's acts taken in his own defense, as well as those taken in defense of a third person.

Then, in sub-paragraphs I(a), I(b), and III(a), the statute imposes several limitations on when a person's defensive use of force is justified. These limitations specifically apply only to the person who actually takes the putatively defensive action. The phrase "or a third person," which appears in paragraphs I and III, is not included in the limitations language contained in sub-paragraphs I(a), I(b), or III(a). The trial court's instructions, on the other hand, informed the jury that if it found that the defendant *or the third person* (his cousin) was in fact the initial aggressor or provoker, then the defendant's actions in defense of his cousin were not justified.

The court's addition of the phrase "or the third person" into the limitations on the defensive use of force is not supported by a plain reading of the statute. We have consistently stated that we will not consider what the legislature might have said or add language to a statute that the legislature did not see fit to include. *See, e.g., Appeal of Local Gov't Ctr.*, 165 N.H at 804. Our conclusion that the added language is in error is also supported by the principle *"expressio unius est exclusio alterius,* the expression of one thing in a statute implies the exclusion of another." *Etienne,* 163 N.H. at 73. This principle "is strengthened where a thing is provided in one part of the statute and omitted in another," *id.* (quotation omitted), such as here, where the general requirements of paragraphs I, II and III mention the actor "or a third person," whereas the limitations applicable to an initial aggressor or provoker found in sub-paragraphs I(a), I(b), and III(a) mention only the actor. Under a plain reading, then, these limitations apply only to the conduct of the actor, not to the conduct of the third person.

Moreover, despite the State's argument to the contrary, we find the trial court's added language inconsistent with the plain meaning of the statute. The omission of third persons from the provisions that limit an actor's ability to use defensive force makes sense because each limitation involves conduct squarely within the actor's personal knowledge: whether he was the initial aggressor, or whether he provoked the use of force. By adding the phrase "or the third person" to the jury instructions, the trial court precluded the defendant from relying on the defense-of-a-third-person defense if his cousin was in fact the initial aggressor or provoker, regardless of whether the defendant knew or reasonably should have known this to be true. In holding the defendant strictly accountable for the actions of his cousin as a predicate to his defensive use of force, the trial court essentially imported the common law "alter-ego rule" into the statute. That rule "held that a defendant using deadly force to defend a person who was not entitled to use deadly force would be held criminally liable." *State v. Cook,* 515 S.E.2d 127, 135 (W. Va. 1999). Thus, a defendant "stepped into the shoes" of the third person he was defending, and his actions would be justifiable only if he was actually correct that the person he defended could have acted in self-defense. *See id.*

"Many jurisdictions began to reject the alter ego rule, to a large extent, because of the position taken by the American Law Institute's Model Penal Code, § 3.05 (1985)." *Id.* "The Model Penal Code adopted the 'reasonable belief' rule, which provided that an intervenor who acts in defense of another is not liable if his or her actions were reasonable under the circumstances." *Id.* This is true "even if the intervenor acted under a

mistaken belief as to who was at fault, provided his or her belief was reasonable." *Id.* The pertinent section of the Model Penal Code states:

> (1) Subject to the provisions of this Section . . . the use of force upon or toward the person of another is justifiable to protect a third person when:
>
>> (a) the actor would be justified . . . in using such force to protect himself against the injury he believes to be threatened to the person whom he seeks to protect; and
>>
>> (b) under the circumstances as the actor believes them to be, the person whom he seeks to protect would be justified in using such protective force; and
>>
>> (c) the actor believes that his intervention is necessary for the protection of such other person.

MODEL PENAL CODE § 3.05 (1985).

■ We disagree with the State that the legislature's failure to adopt the exact language of the MPC left the alter-ego rule intact, as our statute is inconsistent with that rule. As in the MPC, reasonableness is the touchstone of RSA 627:4, and the lens through which the jury must determine whether the defendant's use of force was justified under the circumstances. Under our statute, a person can defend against what he *reasonably believes* to be the imminent use of unlawful, deadly or non-deadly force by another, and can use the degree of force that he *reasonably believes* is necessary for this purpose. *See* RSA 627:4, I; *Etienne*, 163 N.H. at 77 (holding that, in the context of deadly force, the use of force must be reasonably necessary in order to be justifiable). This reasonableness language is fundamentally different from the alter-ego rule, which is not based upon the actor's subjective perception and objectively reasonable perception of the circumstances, but instead is based upon whether the actor was factually correct in his assessment of the circumstances. Furthermore, the State does not point to a single New Hampshire case that discusses — or even mentions — the alter-ego rule in the context of defense of others, or interprets the statute as consistent with the rule.

■ We conclude that our statute is consistent with the MPC, which likewise focuses on reasonableness.[2] While the specific language of the MPC more clearly addresses the situation at issue here — whether or not

---

[2] Our conclusion that reasonableness is the touchstone of our defense of others statute is in keeping with the majority of states, which likewise have defense of others statutes that are consistent with the MPC. *See Cook*, 515 S.E.2d at 135, n.17 (listing state statutes with "defense of another doctrine [that have] been codified consistent with the Model Penal Code").

the defendant knew or should have known that the third person was the initial aggressor or provoker — our statute does so as well, albeit in a less straightforward fashion, by requiring the defendant to reasonably believe that the use of *"unlawful . . . force"* was imminent. *See* RSA 627:4, I, II (emphasis added). If an actor knew or should have known that the third person was the initial aggressor or provoker, then the jury may determine that the actor's use of force against the victim in defense of the third person was not justified because, under those circumstances, the victim's use of force against the third person may not have been *unlawful*. In that situation, the victim may have been *lawfully* using force to defend himself from the third person. However, if the actor neither believed nor reasonably should have believed that the third person was the initial aggressor or provoker, then — assuming all other conditions of the defense also are met — the jury may determine that his use of force against the victim in defense of the third person was reasonable, and thus justifiable, even if the third person actually was the initial aggressor or provoker.

Determining whether the actor's use of force in defense of a third person is justified is ultimately a question of fact for the jury, which must consider, under all the circumstances, whether the. actor reasonably believed that the use of unlawful force against the third person was imminent. Thus, there is no need to import additional language or requirements into the statute, as its language adequately addresses the issue of a defendant's knowledge regarding the third person's status as the initial aggressor or provoker. For the above reasons, we conclude that the trial court's jury instructions were inconsistent with the plain text and meaning of the statute and constituted an error of law.

Next, we evaluate whether the trial court's error was harmless. "An error is harmless only if it is determined, beyond a reasonable doubt, that the verdict was not affected by the error." *State v. Connor*, 156 N.H. 544, 549 (2007). The State has the burden of establishing that an error was harmless. *Id.*

A defendant is entitled to a jury instruction on his theory of defense if there is some evidence in the record that would support a rational finding in favor of the defense. *State v. Vassar*, 154 N.H. 370, 373 (2006). The State does not dispute that the evidence at trial was sufficient to warrant a defense-of-others instruction. Of critical importance, moreover, there also was sufficient evidence in the record from which the jury could have concluded that the defendant's cousin was the initial aggressor or provoker. Thus, this issue was squarely before the jury. *Contra Etienne*, 163 N.H. at 78 ("This case does not present us with a proper opportunity to decide the

boundaries of the defense of others justification, as neither party argued, either at trial or on appeal, that Pierre, the person the defendant was purportedly defending when he killed Lemieux, had provoked the use of force."). Various witnesses testified that the defendant's cousin was both verbally and physically confrontational with several of the victim's friends. One witness testified that the cousin was yelling and swearing at him, and punched him in the head; another witness testified that the cousin pushed him to the ground. Further, in its closing argument, the State characterized the cousin as "angry" and "enraged" at the victim's friends, and said that he yelled at them and followed them down the Mall. There also was evidence that the defendant was unaware of his cousin's actions. The defendant testified that he was not with his cousin when the cousin's encounter with the victim's friends began, and that when he did arrive he believed that his cousin — who was being converged upon and physically assaulted by a group of individuals — was the victim.

■ Given that there was some evidence both that the cousin was the initial aggressor or provoker and that the defendant was unaware of his cousin's aggressive and/or provocative actions, we cannot conclude that the trial court's erroneous instructions did not affect the verdict, and therefore were harmless, beyond a reasonable doubt. *See Connor*, 156 N.H. at 549. Accordingly, we hold that this error requires that the defendant's convictions be reversed and that he be granted a new trial.

### III

The defendant next argues that the trial court erred in finding that there was sufficient evidence to prove that his shod foot met the statutory definition of a deadly weapon. In support of this argument, he points to the facts that he was wearing ordinary sneakers and that he delivered only a single kick to the victim's head. We are not persuaded.

■ "When considering a challenge to the sufficiency of the evidence, we objectively review the record to determine whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, considering all the evidence and all reasonable inferences therefrom in the light most favorable to the State." *State v. Germain*, 165 N.H. 350, 354-55 (2013) (quotation omitted). "It is the defendant who bears the burden of demonstrating that the evidence was insufficient to prove guilt." *Id.* at 355 (quotation omitted). "In reviewing the evidence, we examine each evidentiary item in the context of all the evidence, not in isolation." *Id.* (quotation omitted). "Circumstantial evidence may be sufficient to support a finding of guilty beyond a reasonable doubt." *Id.* (quotation omitted). "Further, the trier may draw reasonable inferences

from facts proved and also inferences from facts found as a result of other inferences, provided they can be reasonably drawn therefrom." *Id.* (quotation omitted).

Under RSA 631:1, I(b), a person is guilty of first degree assault if he "[p]urposely or knowingly causes bodily injury to another by means of a deadly weapon." In this case, the defendant kicked the victim in the head with his "shod foot," which the indictment alleged was a deadly weapon. RSA 625:11, V (2007) defines "deadly weapon" as "any firearm, knife or other substance or thing which, in the manner it is used, intended to be used, or threatened to be used, is known to be capable of producing death or serious bodily injury." We have said that the critical phrase is whether "the manner [in which an object] is used, intended to be used, or threatened to be used" can produce death or serious bodily injury. *State v. Hull*, 149 N.H. 706, 714 (2003). "Many innocuous everyday objects become deadly weapons when they are put to assaultive uses. It is only the specific manner of use and the circumstances surrounding that use that make such everyday objects capable of producing death or serious bodily injury." *Hull*, 149 N.H. at 714. "For this reason, the issue is factual and must be resolved by a jury" based upon the totality of the circumstances. *Id.* at 714-15.

In this case, there was sufficient evidence for the trier of fact to have found beyond a reasonable doubt that the defendant's shod foot constituted a deadly weapon. The defendant's kick was described as "roundhouse," "pretty serious," "fast and powerful," "athletic," and "very hard." The victim was seriously injured as a result of the kick to the face. Various witnesses testified that he was immediately rendered unconscious: his "arms locked straight, and his fists clenched . . . [and] his entire body became rigid." The victim "just fell over like a tree" without bracing his fall and hit his head on the pavement. The victim was transported to the hospital, where he remained in the intensive care unit for three days, and was diagnosed with a concussion, a skull fracture, and an inter-cranial hemorrhage.

We find unconvincing the defendant's protestation that, because he delivered only a single kick to the victim's face, as opposed to multiple blows, his shod foot was not a deadly weapon. While the number of kicks could be relevant to a determination of whether a shod foot constitutes a deadly weapon, multiple kicks are by no means a necessary prerequisite to such a finding. We likewise are not persuaded by the argument that the sneaker was not made or altered in any way so as to make it more dangerous than any other sneaker. "We have never required that an object be intrinsically capable of causing death or injury." *Hull*, 149 N.H. at 715. Rather, as stated, we look to whether the manner in which the object was used was capable of causing death or serious bodily injury. We conclude

that a rational trier of fact, viewing the evidence in the light most favorable to the State, could have found beyond a reasonable doubt that the defendant, by delivering a roundhouse kick to the victim's face, used his shod foot in a manner capable of producing death or serious bodily injury. Thus, the trial court did not err in denying the defendant's motion to dismiss the first degree assault charge.

## IV

Finally, the defendant contends that the trial court erred by allowing the State to introduce evidence of his three prior felony convictions for impeachment purposes. He argues that the probative value of the convictions did not outweigh their prejudicial effect. We disagree.

Before trial, the State filed a motion *in limine* to impeach the defendant with his 2006 convictions of the following three offenses: criminal threatening, receiving stolen property, and second degree assault. *See* N.H. R. Ev. 609(a)(1), (b). The State argued that the convictions were admissible because each was punishable by imprisonment in excess of one year, they had been entered less than ten years before trial, and their probative value outweighed any prejudicial effect to the defendant because his credibility was a critical issue at trial. The defendant objected and argued, among other things, that the probative value of the convictions was low and that there was a danger of unfair prejudice. The trial court granted the State's motion but precluded the State from inquiring about the specific nature of the offenses.

At trial, the defendant testified on direct examination that he had three felony convictions from 2006 that "stemm[ed] from the same incident." On cross-examination, the prosecutor asked the defendant, "So it's true that you have three felony convictions, right?" The defendant answered affirmatively, and the prosecutor followed up by asking if they had all occurred in 2006, to which the defendant replied, "Yes." Neither the names of the specific felonies, nor any pertinent details, were exposed to the jury.

"We review a trial court's ruling to admit evidence of prior convictions under an unsustainable exercise of discretion standard." *State v. Long*, 161 N.H. 364, 367 (2011) (quotation omitted). "To show an unsustainable exercise of discretion, the defendant must demonstrate that the court's ruling was clearly untenable or unreasonable to the prejudice of his case." *Id.* (quotation omitted). The defendant's 2006 convictions were admitted pursuant to New Hampshire Rule of Evidence 609 which provides, in pertinent part:

> (a) General rule. For the purpose of attacking the character for truthfulness of a witness,

(1) evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused.

. . . .

(b) Time limit. Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect.

N.H. R. Ev. 609(a)(1), (b).

■ "Prior convictions are admissible to impeach a defendant even if the crimes do not directly involve a lack of veracity." *State v. Hebert*, 158 N.H. 306, 311 (2009) (quotation omitted). "Jurors ought to be informed of what sort of person is asking them to take his word, and lack of trustworthiness may be evinced by a defendant's *abiding and repeated* contempt for laws which he is legally and morally bound to obey." *Id.* (quotation and brackets omitted). When balancing the probative value and prejudicial effect under Rule 609(a), the following factors are relevant: "the impeachment value of the prior conviction, the date of the conviction and the witness's subsequent history, the degree of similarity between the past crime and any conduct of the witness currently at issue, the importance of the witness's testimony, and the centrality of the credibility issue." *Id.* (quotation omitted). In considering the prejudicial effects of crimes that do not involve dishonesty or false statement, like those here, the following two factors are relevant: (1) "the inherent ability of a crime to appeal to a jury's sympathies, arouse its sense of horror, provoke its instinct to punish, or trigger other mainsprings of human action"; and (2) "when the witness is also the defendant, the similarity between the conviction introduced for impeachment purposes and the crime for which the defendant is on trial." *Id.* (quotations omitted).

■ The defendant first argues that the probative value of his prior convictions was low, as none of the crimes involved elements of dishonesty or deceit. But, as we have said before, "[W]e reject the defendant's attempt

to minimize the probative value of his felony offense[s] . . . because [they] did not involve dishonesty or a false statement." *Id.* at 312. By asserting defense of a third person, the defendant was asking the jury to believe his testimony that he assaulted the victim in order to protect his cousin. *See id.* Thus, the probative value of the defendant's prior convictions was high, given the "particular importance" and centrality of his credibility. *Id.* (quotation omitted).

The defendant next argues that the prejudicial effect of the prior convictions outweighed their probative value. We disagree. Given that one of his prior convictions was for second degree assault, a crime similar to those for which he was on trial, and that all the prior convictions stemmed from the same incident from which the assault conviction arose, the trial court appropriately minimized any potential for prejudice to the defendant by limiting the State to inquiry solely into the existence of the three convictions. Because the State was prohibited from identifying either the names of the felonies or details thereof, the additional factors regarding the inherent ability of the crimes to arouse the jury's sympathies, horror, or instinct to punish, and whether the prior felonies were sufficiently dissimilar to the charged assault, are not relevant to our determination in this case. *See Hebert,* 158 N.H. at 311. We thus conclude that because the probative value of the prior convictions outweighed the danger of unfair prejudice to the defendant, the trial court properly allowed the defendant to be impeached with his prior convictions.

*Reversed and remanded.*

DALIANIS, C.J., and HICKS, CONBOY, and BASSETT, JJ., concurred.